KAVANAUGH *v.* BAIRD.

1. JUDGMENT — DOCTRINE OF RES ADJUDICATA NOT APPLICABLE WHERE PARTIES DIFFERENT ALTHOUGH SAME QUESTIONS INVOLVED.

A former adjudicated case is not *res adjudicata* of the instant case, although the same questions are involved and the decision therein is controlling unless overruled, where the parties are not the same and they are not privies.

2. NAVIGABLE WATERS—GREAT LAKES—TITLE TO LAND FORMING PART OF BOTTOM OF GREAT LAKES AT TIME STATE WAS ADMITTED VESTS IN IT.

Title to land which was part of the lake bottoms of the Great Lakes at the time the State was admitted to the Union passed to the State in trust for its people, and title thereto does not change although a portion of it become dry land.

3. SAME—TITLE TO RELICTED LAND IS IN STATE.

Where the waters of Saginaw Bay receded, leaving a strip of land between the meander line and the present waters, title thereto is in the State in trust for its people rather than in the riparian owner.

4. EVIDENCE—JUDICIAL NOTICE—WATERS OF GREAT LAKES RECEDING.

The court takes judicial notice of the fact that for some years the waters of the Great Lakes were receding.

5. NAVIGABLE WATERS—RIPARIAN OWNERS HAVE RIGHT OF ACCESS TO NAVIGABLE WATERS—RIGHT TO CROSS RELICTED LAND.

The paramount right of riparian owners on navigable waters of access to such waters for all lawful purposes extends from the meander line to the waters, even though the intervening space is now by accretion and reliction dry land; and although title to such relicted land is in the State in trust for its people, it may not put it to any use that will infringe such right.

---

[1]Judgments, 34 C. J. § 1480; [2]Navigable Waters, 29 Cyc. pp. 350, 356; 42 L. R. A. 175; L. R. A. 1916C, 150; 23 A. L. R. 778; 27 R. C. L. 1375; 3 R. C. L. Supp. 1551; 4 R. C. L. Supp. 1794; [3]Id., 29 Cyc. p. 350; [4]Evidence, 23 C. J. §§ 1810, 1861; [5]Navigable Waters, 29 Cyc. p. 336.

6. SAME—COURTS — CONSTITUTIONAL LAW — STATE LAW CONTROL-
LING.
    Under the decisions of the Federal Supreme Court the
    law of the State in which the lands lie is controlling as
    to whether title to relicted lands bordering on the Great
    Lakes vests in the State or in the littoral owner, and
    therefore no rights secured by the Federal Constitution are
    infringed by decision of the State court that title to such
    lands vests in the State.

Appeal from Bay; Houghton (Samuel G.), J.    Sub-
mitted June 15, 1927.    (Docket No. 81.)    Resub-
mitted December 1, 1927.    Decided January 3, 1928.

Bill by William P. Kavanaugh against John Baird,
director of conservation of the State of Michigan, to
quiet title to land.    From a decree dismissing the bill,
plaintiff appeals.    Modified and affirmed.

*Hubert J. Gaffney* (*William M. Mertz* and *Laurence
W. Smith,* of counsel), for plaintiff.

*William W. Potter,* Attorney General, and *Carl D.
Mosier* and *M. M. Larmonth,* Assistants Attorney Gen-
eral, for defendant.

FELLOWS, J.    Plaintiff files this bill against the
director of conservation to quiet title to a strip of
land several hundred feet in width between the
meander line and the present waters of Saginaw Bay,
a part of Lake Huron.    It is his claim that he owns
the fee by reason of accretion and reliction, and that
such title has been assailed by the defendant, who
asserts that the title is in the State in trust for its
people.    From a decree dismissing his bill and sus-
taining defendant's contention, he appeals.

It is suggested rather than insisted upon by the
attorney general, that plaintiff has not established
title to the fast land.    But upon the hearing in the

⁶Navigable Waters, 29 Cyc. p. 350.

court below plaintiff's counsel put in evidence the abstracts of his title, and it was conceded that he had title, to the meander line. The abstracts have been filed with the other exhibits in this court. We shall accept the concession, and assume plaintiff's title to the meander line to be unassailable. The strip involved has been platted into lots, is known as Aplin beach, and the lots have been leased to various parties who have erected cottages and who pay rent to plaintiff. The trial judge found the strip was the result of accretions, but we are satisfied from the record, and the facts of which we take judicial notice, that it was formed by both accretions and reliction, the latter being the most potent. Saginaw Bay is very shallow at the shores, and but slight recession of the water uncovers a large area. The main question in the case, whether plaintiff has title in fee to the *locus in quo* and may put it to such legitimate use as he desires, is to be solved by the further question of whether we should at this time overrule *Kavanaugh* v. *Rabior*, 222 Mich. 68. That case of ejectment involved a portion of the disputed strip, was brought by the present plaintiff upon the same claims here asserted, and defended by a private individual upon the same ground here defended by the State. That case is not *res adjudicata* of the present case, as claimed by defendant; the parties are not the same, nor are they privies, but that case did decide the questions here involved, and necessarily involved, and unless we are prepared to overrule it, it is controlling. It was there held that the title to the strip of land between the meander line and the then waters of the bay, which this record discloses has materially increased since the trial of that case, being a part of the lake bottom of Lake Huron at the time the State was admitted into the Union, passed to the State in trust for its people. The language there and here controlling

in addition to the recognition of the trust doctrine in the bottoms of the Great Lakes was and is the following language of Mr. Justice BIRD, speaking for the unanimous court:

"When the meander line was established it fixed the status of the disputed strip as lake bottom, and this status in the law would not change even though a portion of it had become dry land."

If the title to the lake bottom passed to the State in trust upon its admission to the Union, and that title did not shift and change with the shifting and changes in conditions, and we so held in that case, then the title to the property here in question is in the State in trust, and is not in the plaintiff, and to sustain the plaintiff's contention necessitates the overruling of the *Rabior Case* and the cases which have preceded it.

The so-called "trust doctrine," as applied to the Great Lakes, is now recognized beyond question by this court. While its applicability to inland waters has not received unanimous approval (see *Collins* v. *Gerhardt,* 237 Mich. 38), I do not understand that its applicability to the Great Lakes is questioned by any member of this court.    But it has been a matter of slow growth. General language recognizing it will be found in opinions, but the subject was not considered in detail and the reasons upon which it was bottomed pointed out until Mr. Justice HOOKER wrote his exhaustive opinion dealing with the subject in *State* v. *Fishing & Shooting Club,* 127 Mich. 580.    No one signed with Mr. Justice HOOKER, but he again wrote in *Olds* v. *State Land Commissioner,* 134 Mich. 442, adhering to his former views.    On rehearing of this case an issue was framed and the case again came before the court in *Olds* v. *Commissioner of State Land Office,* 150 Mich. 134.    Mr. Justice MONTGOMERY, who wrote the prevailing opinion, did not go as far as Mr. Justice

HOOKER'S views, as expressed in the *Fishing & Shooting Club Case*, and Mr. Justice HOOKER concurred in the result reached in a short opinion. But Mr. Justice HOOKER lived to see his views become the holding of the court in the unanimous opinion in *State* v. *Venice of America Land Co.*, 160 Mich. 680, which we shall now consider.

Our Reports will disclose that, covering a number of years, the State was involved in litigation concerning the St. Clair Flats. Each case had been decided upon the record as made in that particular case, and as a result there had not been such a finality of decision as fixed the State's title and its rights once and for all. Private parties were occupying, and seeking the right to occupy, this valuable territory for little or no consideration. The State, of course, desired that its title and rights be fixed by a decision that would be a finality, not only as to the case in hand but for all time and for territory of a similar character. The Venice of America Land Company had platted a vast territory on the Flats and had advertised it for sale to the public in defiance of any rights of the State. Thereupon the State filed its bill. A large amount of testimony was taken. It appears in the two volumes of record in that case. The case was exhaustively briefed; the briefs filed aggregating 336 pages. The State realized that, to maintain its bill, it must satisfy the court as a fact that the territory was lake bottom at the date the State was admitted into the Union, and it must satisfy the court as matter of law that the State then took title in its sovereign capacity in trust for its people, and that the conditions then existing were controlling for all time. This it succeeded in doing. The court found that the *locus in quo* was lake bottom at the time the State was admitted into the Union, it applied the trust doctrine, and in one terse sentence sustained the contention that conditions

at the date of the admission of the State into the Union controlled.      Mr. Justice STONE, speaking for the court, said:

"The condition of this territory when the State was admitted into the Union is the condition which must control.      That the State of Michigan holds these lands in trust for the use and benefit of its people—if we are correct in our conclusion—cannot be doubted.      The State holds the title in trust for the people, for the purposes of navigation, fishing, etc.      It holds the title in its sovereign capacity."

We shall have occasion to refer to this case later. Following this decision, the legislature passed a comprehensive act for the leasing and control of lands of this character (Act No. 326, Pub. Acts 1913 [1 Comp. Laws 1915, § 606 *et seq.*]).      It has been amended from time to time (Act No. 12, Pub. Acts 1917 [Comp. Laws Supp. 1922, §§ 610, 616, 630]; Act No. 382, Pub. Acts 1921 [Comp. Laws Supp. 1922, § 616]; Act No. 48, Pub. Acts 1923).      Its validity was upheld in *Nedtweg* v. *Wallace,* 237 Mich. 14.

This court, irrespective of what other courts have held, and irrespective of what textwriters have said, is committed to the trust doctrine as applied to lake bottom lands in the Great Lakes.      We shall not again review the authorities sustaining that doctrine.      Mr. Justice HOOKER reviewed them exhaustively in *State* v. *Fishing & Shooting Club, supra,* and the writer considered them at some length in *Collins* v. *Gerhardt, supra.*

But long before the *Venice of America Land Company Case,* and in 1888, it was held by this court in *Sterling* v. *Jackson,* 69 Mich. 488 (13 Am. St. Rep. 405), that the title to shore lands on the Great Lakes did not change with a change in conditions.      The reverse of the present situation was then before the court. There the land had been inundated by navigable water.      Plaintiff Sterling had obtained a patent from

the State of lands adjoining Lake Erie, which lands were granted to the State under the act of congress of September 28, 1850, commonly known as the "swamp land act." Their character had in the meantime materially changed, and at the time of the alleged trespass they were covered by water navigable in fact, and navigation over them was common. Mr. Justice CAMPBELL pointed out, in his dissenting opinion, that for 32 years the *locus in quo* had been "open water." Mr. Justice CHAMPLIN, who wrote the prevailing opinion, recognized that this fact constituted an implied license to the use by the public of the navigable waters, but held that, when such license was revoked by the owner of the fee, the action could be maintained by such owner for a trespass thereafter committed and it was held (quoting from the syllabus) :

"Lands lying in the State of Michigan which belonged to the United States at the date of the passage of the act of September 28, 1850, and which came within the class of swamp and overflowed lands referred to in that act, became the property of the State of Michigan, and any change in the condition of such lands afterwards from natural causes, whether they become dryer or more overflowed, could not deprive the State of its title to such lands." * * *

Plaintiff's counsel urge that *People* v. *Warner*, 116 Mich. 228, sustains their contention. Language will be found in the opinion in that case having such tendency. But we must consider what was then before the court and what was then decided. To aid us we have examined the record and briefs in that case. The action was ejectment. The trial judge had directed a verdict for the plaintiff. So that defendant was entitled to the most favorable consideration of the testimony. Among the contentions of defendant and one very strongly urged was that he as riparian owner was entitled to access to navigable water, and

that it was unimportant whether the stretch of relicted land was much or little. The brief of defendant's counsel cites and considers many of the authorities here cited by plaintiff's counsel. We quote from that brief:

"Following this doctrine I contend that my client being the owner of an island, has the right to a shore entirely around it fronting upon navigable waters, on which if he should see fit he could construct landings, wharfs or piers for his use of such island.  *  *  *

"A principle must be established, and that principle must be founded upon reason. The reason that permits one to pass a meandered line is a plain one. We are entitled to go to the navigable water. If it can be said that when the lands lying between the meandered line and navigable waters amount to 600 or 800 acres the rule will not obtain, then there is no reason for the rule, and the meandered line should govern in all cases.

"I trust that the specious argument made by counsel for the plaintiffs in the circuit court in this respect will have no force in this court."

In considering this contention, it was said by Mr. Justice HOOKER, speaking for the court:

"It is contended that the defendant Warner, as littoral proprietor, has a right of access to navigable water to the eastward of Maisou. If this is true (which we do not intimate), it is merely a right to use the intervening land for the purpose, which does not interfere with the rights of the public, and does not support a right to take full possession, and exclude both the State and the public from a large area of land and water, under a claim of title in fee."

We shall presently consider the question of plaintiff's right to reach navigable waters, but the opinion in the *Warner Case* must be accepted as holding that such rights do not carry to the riparian owner the fee to the intervening land as against the State.

We shall not be able within the compass of this opinion to discuss all or any considerable number of

the cases from other jurisdictions which have been cited to us by plaintiff's counsel.   It is but fair to state that we have spent weeks in the consideration of this case, and we have not found any cases in this country or in England favorable to plaintiff's claim which had not already been garnered by his counsel and submitted to us in their briefs.   We should, however, consider some of the cases from other States in which the State was a party and asserting its rights.   Three recent cases especially should be considered, as they were cases in which the attorney general appeared in behalf of the State.   The opinions in these cases are exhaustive.   In *State* v. *Railroad Co.,* 94 Ohio St. 61 (113 N. E. 677, L. R. A. 1917A, 1007), the attorney general sought to restrain the defendants from using the subaqueous lands in the harbor at Cleveland on Lake Erie for dockage and wharfing facilities.   The defendants conceded that the title to the subaqueous lands was in the State in trust, but claimed that they had the right to use them for wharfing out and dockage purposes, that this was an aid to commerce and did not interfere with navigation, that the Federal authorities had fixed a harbor line beyond which defendants had not extended their wharves and docks.   It will, therefore, be noted that defendants did not claim the fee, but only the right of wharfing out.   The court denied relief to the State.   It is doubtful if this court on a similar record would have reached a different result.   It should be noted that the Ohio court expressly recognized the trust doctrine, and said:

"The State as trustee for the public cannot by acquiescence abandon the trust property or enable a diversion of it to private ends different from the object for which the trust was created.

"If it is once fully realized that the State is merely the custodian of the legal title, charged with the specific duty of protecting the trust estate and regulating its use, a clearer view can be had.

"An individual may abandon his private property, but a public trustee cannot abandon public property. Mere nonuser of the trust property by the public cannot authorize the appropriation of it by private persons to private uses and thus thwart the purposes of the trust."

*Brundage* v. *Knox,* 279 Ill. 450 (117 N. E. 123), both in the language used in the opinion and in the result reached unqualifiedly sustains plaintiff's contention. The suit was instituted by the attorney general on behalf of the State and the land in question was beyond the meander line of Lake Michigan. *Doemel* v. *Jantz,* 180 Wis. 225 (193 N. W. 393, 31 A. L. R. 969), also sustains plaintiff's contention. It was litigation between private parties, in which the attorney general, by leave of the court, was permitted to intervene. But it did not involve the beds of the Great Lakes. The lake was an inland one, and the *locus in quo* was the strip between high and low water. In the earlier case of *Lamprey* v. *State,* 52 Minn. 181 (53 N. W. 1139, 18 L. R. A. 670, 38 Am. St. Rep. 541), the State was made a party because of its claim of an interest in the bed of a small inland lake which had become dry land. The court denied the right of the State, and held the title to be in the riparian owner. In the later case of *State* v. *Korrer,* 127 Minn. 60 (148 N. W. 617, L. R. A. 1916C, 139), the public was likewise a party. The right to mine iron ore under the waters of a small inland lake was involved. It was held that the riparian owner had title to the ore under the strip between high and low water mark and could exercise such right when the water was at low water mark.

But in none of these cases, nor in others where the public was interested, was the claim made, or at least passed upon, that on the day of its admission into the Union the State acquired its title in trust, and that such title was neither lost nor enlarged by the changes

in conditions occurring from year to year. The courts all seem to be impressed with the value of the right of the riparian or littoral owner to reach navigable waters. Thus, in *Brundage* v. *Knox, supra,* it was said:

"This right is not mainly based, as argued by counsel for appellant, upon the right to the title to the submerged lands, but largely, if not chiefly, upon the right of access to the water, otherwise the owners of lands along Lake Michigan might, by losing their frontage by accretion, be debarred of valuable rights for which there would be no adequate redress."

And in *Lamprey* v. *State, supra,* it was said:

"But it seems to us that the rule rests upon a much broader principle, and has a much more important purpose in view, viz., to preserve the fundamental riparian right—on which all others depend, and which often constitutes the principal value of the land—of *access* to the water.

"The incalculable mischiefs that would follow if a riparian owner is liable to be cut off from access to the water, and another owner sandwiched in between him and it, whenever the water line had been changed by accretions or relictions, are self-evident, and have been frequently animadverted on by the courts."

This right of access to navigability is a valuable right and should be protected, but this court did not find it necessary in the *Warner Case* to hold that the fee to the soil passed to the littoral owner in order to protect such right, and we are clearly of opinion that we should differentiate between the right of access to navigability on the Great Lakes and the right to the fee of that which was subaqueous lands when the State was admitted into the Union and the title to which passed to the State in trust on that day.

Counsel have cited us to numerous decisions holding that the riparian owner takes title or at least a qualified title to low water mark, and holding that the meander line is not controlling as a boundary but only for the

purpose of fixing the acreage.    In the main, these cases involve inland lakes and streams.    Counsel, however, stress *La Porte* v. *Menacon,* 220 Mich. 684.    That case involved the construction of the word "shore" in a contract which we found the parties had themselves construed.    But we entertain no doubt on this record and upon the facts of which we take judicial notice that the meander line correctly delineated the boundary between the water and fast land at the time it was run.    One of plaintiff's exhibits, a government document, establishes that in 1838 the level of Lake Huron was 584.68.    This was the year after the State was admitted into the Union and the year before the survey of the land in this part of the State began.    The testimony quoted in the *Venice of America Land Company Case* shows that 1837 and 1838 were years of high water, the culmination coming in 1838, the year before the survey began.    At but one point on the map prepared by plaintiff's surveyor for use in this case, and which shows present conditions, does the land at the meander line exceed the figure given of the level of Lake Huron in 1838, and the plaintiff's testimony all shows that silt, bark, and other material have been washing in for years.    We also take judicial notice that for some years the waters of the Great Lakes were receding.    Indeed, the *Venice of America Land Company Case* demonstrates that the waters of the Great Lakes rise and fall over a cycle of years.    It would be of little avail to plaintiff to hold that he took title to low water mark unless we also hold that he took title to the *present* low water mark.    There is no testimony showing where the low water mark was in 1837, and accepting all plaintiff's claims for the variation between high and low water mark, it is patent that the cottages erected by plaintiff's lessees are below the low water mark of 1837.    However, Mr. Justice GRANT, speaking for the court in *Ainsworth* v. *Hunting & Fishing Club,* 159 Mich. 61, said:

"It is the established law of this State that riparian owners along the Great Lakes own only to the meander line, and that title outside this meander line, subject to the rights of navigation, is held in trust by the State for the use of its citizens."

*Brown* v. *Parker*, 127 Mich. 390, involved rights under a patent issued pursuant to the swamp land act to lands on Lake Erie. Speaking for the court, it was said by Mr. Justice HOOKER:

"We are of the opinion that the survey of the government, and transfer to and sale by the State to the meander lines, as State swamp land, conclusively establish the boundaries of the lake, and that title of abutting proprietors extend to them upon the presumption that must be conclusive, *i. e.*, that when the meander lines were run they followed the true shore of the lake."

To overrule the *Rabior Case* would require us to overrule *Sterling* v. *Jackson, supra, State* v. *Venice of America Land Co., supra,* and probably *Ainsworth* v. *Hunting & Fishing Club, supra, Brown* v. *Parker, supra,* and the cases which have followed them. To overrule these cases would be to turn over to private ownership hundreds of thousands of acres of land which the recent low waters in the Great Lakes have uncovered and which form a fringe around our great inland seas and exclude the public from any beneficial use of them. These holdings may be out of line with the holdings in other jurisdictions. They may be out of line with the writings of textwriters and the decisions of other courts. We may concede them to be against the overwhelming weight of authority, but we should not overrule them for this reason when the effect would be to produce such staggering results. They have fixed a rule of property for this State. True, the property is public property, but that does not alter the reason for the rule. The property is held in trust for the use and benefit of over four

millions *cestuis que trustent,* and they are entitled to the enforcement of the doctrine of *stare decisis.* In so far as the decree fixes the title to the land in question in the State in trust for its people, it will be affirmed.

Changes in condition from year to year do not change the title or rights of the State. They are fixed as of the date of the admission of the State into the Union. So, likewise, are the rights of the riparian owner. When the State was admitted into the Union the lands here bordering on Saginaw Bay were owned by the Federal government. It held them as proprietor and when it sold, the right of a riparian owner as of that date passed to its grantee. The authorities in this State and others all agree that the paramount right of the riparian owner on navigable waters is the right of access to navigable waters; the right to wharf out to navigability so long as he does not interfere with navigation has long been recognized as valuable and of which he cannot be deprived. He has other rights in waters adjoining his land. He may bathe in them (*People* v. *Hulbert,* 131 Mich. 156 [64 L. R. A. 265, 100 Am. St. Rep. 588]), water his stock, withdraw water for domestic purposes. Other rights will suggest themselves. We are here dealing with the rights of the State in the waters of the Great Lakes as against the rights of the riparian owner, and what is here said, of course, applies only to the question before us. Upon the Great Lakes the right of the riparian owner to erect docks, to wharf out to navigability, is not only valuable to the riparian owner but an absolutely necessary aid to navigation. Without wharves and docks built by riparian owners commerce on the Great Lakes would come to an end. This right to reach navigable waters for all lawful purposes extends from the meander line to such navigable waters even though the intervening space is now by accretion and reliction

dry land, and the State cannot put such dry land to any use that will infringe such rights. The decree should be modified to protect such rights..

But one other question requires consideration. It is insisted that to hold that plaintiff is not entitled to the fee of this strip of land would infringe his rights secured by the Federal Constitution. In *Hardin* v. *Jordan*, 140 U. S. 371 (11 Sup. Ct. 808, 838), it was said:

"We do not think it necessary to discuss this point further. In our judgment the grants of the government for lands bounded on streams and other waters, without any reservation or restriction of terms, are to be construed as to their effect according to the law of the State in which the lands lie."

See, also, *City of St. Louis* v. *Myers*, 113 U. S. 566 (5 Sup. Ct. 640).

We have called attention to the act of 1913. Other States have had occasion to deal with a similar question. In some instances the subaqueous lands may only be leased to the littoral owner; in others the littoral owner must be compensated before a lease is given. Whether further legislation is needed, or whether the exercise of hard-headed common sense by both littoral owner and the conservation department will solve their problems, are questions not for us to determine.

A decree will be here entered in accordance with this opinion. No costs will be allowed either party.

FLANNIGAN, C. J., and NORTH, CLARK, MCDONALD, BIRD, and SHARPE, JJ., concurred. WIEST, J., concurred in the result.