## VAN DORPEL *v.* HAVEN-BUSCH COMPANY.

WORKMEN'S COMPENSATION—SPECIFIC LOSSES—TOTAL DISABILITY—
EQUALLY DIVIDED COURT.

An award of workmen's compensation for total disability less
credit for compensation already paid for specific losses of 4
fingers and 1 leg, where plaintiff was admittedly totally dis-
abled when compensation for such specific losses was com-
pleted, is affirmed by an equally divided court (CL 1948,
§§ 412.9, 412.10).

Appeal from Workmen's Compensation Appeal
Board. Submitted January 11, 1957. (Docket No.
44, Calendar No. 46,907.) Decided October 7, 1957.

Peter Van Dorpel presented his claim against
Haven-Busch Company, employer, and Metals Mu-
tual Insurance Company, insurer, for compensation
on the basis of total and permanent disability after
having received compensation for specific injuries
including loss of 1 leg and 4 fingers. Award to plain-
tiff. Defendants appeal. Affirmed by an equally
divided court.

*Stephen A. Bryant,* for plaintiff.

*McCobb, Heaney & Dunn* (*Gordon B. Boozer,* of
counsel), for defendants.

VOELKER, J. (*for affirmance*). On December 22,
1948, Peter Van Dorpel a 65-year-old widower with-

REFERENCES FOR POINTS IN HEADNOTES
[1] 3 Am Jur, Appeal and Error §§ 1160, 1164.

out dependents was working at the job he had followed for upwards of 5 years: painting steel beams and angle irons for his employer. When painting heavy steel beams it was the practice to rest a number of beams on steel shophorses, attaching the one being painted to an overhead electric chain hoist, which from time to time could be operated for ease in maneuvering or turning the beam on which a man was working. On the day in question, as one of the beams was being turned on the chain hoist, the chain broke and the beam fell, striking the right leg of Peter Van Dorpel and forcing another beam against his right hand, with which he painted.

In the accident the right leg was badly crushed and the 4 fingers of the right hand were dismembered at the palm. During subsequent hospitalization it was deemed necessary on January 18, 1949, to amputate the leg above the knee. In due course Mr. Van Dorpel was paid compensation on the basis of specific losses of members of the body in accordance with the schedules as they then existed, namely, for the loss of 4 fingers and a leg. At the expiration of this period the payments were stopped and Mr. Van Dorpel applied for further compensation. In an award dated May 10, 1955, the hearing officer found that the claimant "has a further total disability above and beyond the specific losses suffered in the accidental personal injury" of December 22, 1948, and further compensation was ordered.

From this award the defendant company and its insurer sought review, and on April 13, 1956, a divided appeal board affirmed the award, modifying it to provide that compensation should not exceed 750 weeks from the date of injury. From this decision the defendants applied to this Court for leave to appeal, which was granted. For convenience hereafter the 2 corporate appellants will be referred to in the third person singular.

The material facts as to the injury and extent of disability are not in dispute. The thumb was not involved and there were no other injuries or complications. Healing recovery from the amputation was normal. There was medical and other testimony that the claimant had lost the industrial use of his hand and had difficulty in walking, dressing and feeding himself. No question is presented as to whether or not Peter Van Dorpel is in fact totally and permanently disabled from any further industrial employment. All are agreed that he is. The sole question for our determination is the narrow legal one of whether or not recovery for specific losses under part 2, § 10 of the act operates as a legal bar to any additional recovery under section 9.

Since its enactment in this State in 1912, section 9 of part 2 of the workmen's compensation act has provided for compensation for total incapacity and section 10 has provided for compensation for partial incapacity and also for enumerated specific losses of members of the body, certain enumerated combined losses also there being declared to result in total disability. Despite occasional amendments to both sections, the basic design of each has remained substantially unchanged.

At the time of this accident the applicable portion of section 9,* after stating the weekly payments for total incapacity for work, read as follows:

"And in no case shall the period covered by such compensation be greater than 500 weeks from the date of the injury, nor shall the total amount of all compensation exceed $10,500.00, except for permanent and total disability, when the compensation shall be paid for 750 weeks from the date of the injury."

* See CL 1948, § 412.9 (Stat Ann 1947 Cum Supp § 17.159).— REPORTER.

Likewise section 10\* :

"In cases included by the following schedule, the disability in each such case shall be deemed to continue for the period specified, and the compensation so paid for such injury shall be as specified therein, to-wit:"

There then follows the list of specific losses of members of the body coming within the schedule for which payment must be made for a specified number of weeks depending upon the particular member or members lost. In December, 1948, this schedule provided for a total of 100 weeks for the loss of the first, second, third and fourth fingers, and further provided for 200 weeks for the loss of a leg.

It is the contention of the appellant that the payment of compensation for the scheduled number of weeks provided by section 10 for the specific loss of 4 fingers of the right hand and the loss of the right leg acts as a permanent legal bar and limitation to the allowance of any further or other compensation whatever to the claimant, regardless of his condition or state of recovery or inability to work at the end of that time. In other words appellant claims that these provisions of section 10 set both the maximum as well as the minimum of compensation payments allowable and that in no event may a claimant later seek recovery for total disability for such injuries and losses under section 9.

In support of his position he cites as bearing on this point 5 cases. They are: *Limron* v. *Blair* (1914), 181 Mich 76 (5 NCCA 866) ; *Curtis* v. *Hayes Wheel Company* (1920), 211 Mich 260; *Addison* v. *W. E. Wood Co.* (1919), 207 Mich 319; *Stackhouse* v. *General Motors Corp.* (1939), 290 Mich 249; and

---

\* See CL 1948, § 412.10 (Stat Ann 1947 Cum Supp § 17.160).—
Reporter.

*Clements* v. *Chrysler Corporation* (1948), 321 Mich 558.

In his brief and argument appellee attempts to distinguish appellant's cases; he also hints but does not quite bring himself to say that some of them are bad law; and he further attempts to differ his situation from that of the *Curtis Case* by urging that here we have multiple grave cumulative losses from a common accident, amounting in fact to admitted total disability, whereas there there was but the loss of a single member. He also claims that he is entitled to recover total disability under section 10 for the combined loss of a hand and leg, a proposition anticipated, argued and denied by the appellant.

Of the cases cited by appellant we believe the *Curtis Case,* decided in 1920, is the one most squarely in point. There the applicant suffered an injury to his leg necessitating amputation between 4 and 5 inches below the knee joint. Agreed compensation was paid for the specific loss of a foot for the total number of weeks then provided. Following this the applicant filed a petition for further compensation, alleging nonrecovery and continued incapacity to work. After a hearing the board found that the total incapacity to work existed and made an award accordingly.

In vacating that portion of the award allowing compensation beyond the number of weeks then allowed for specific loss under section 10, this Court there said (p 264):

"This leads to a careful consideration of the several provisions of sections 9 and 10, part 2 of the act. * * * Section 9 provides for compensation in cases where the incapacity for work is total. Applicant is entitled to recover under it until the time when his foot was amputated. Thereafter his claim comes under the provisions of section 10 which specifically allows 'For the loss of a foot, 60% of average weekly

wages during 125 weeks.' As soon as the amputation was performed, he became disabled by the loss of his foot. He suffered no other injury than that which resulted in the amputation. As the act provides specific compensation for the loss of a foot, we are of the opinion that all liability of defendants ceased when payment was made for the full term of 125 weeks. These specific items of compensation fixed by the act must control when no other disability than such as results from the removal of the member exists. To hold otherwise would, so far as the employer is concerned, render this provision nugatory and of no effect. Should the employee recover from the effects of the amputation in a few weeks and be able to resume his employment, the payments secured to him on account thereof are in no way affected but continue during the term fixed. *To hold that when his recovery is not fully completed at the expiration of the stated term he may present a claim for further compensation under section 9, would give him an advantage not contemplated in the act.*" (Italics ours.)

At the outset we must record the fact that the Court which signed the unanimous opinion in the *Curtis Case* had already done much to promulgate a broad and liberal interpretation of the workmen's compensation act and continued to make many notable contributions in that direction after the *Curtis Case* was decided. Both fairness and candor demand that this be freely acknowledged. But few courts are infallible, especially when they are construing comparatively new legislation; and sometimes the full implications of a given interpretation of a statute can best be appraised only by living with it. Judges are no less fallible than other men and no originality is claimed when we suggest that sometimes in this area, as in other areas of life, experience is often the best teacher. In the light of this ac-

knowledgment and these observations, then, we shall proceed to appraise the *Curtis Case.*

After 37 years we now make bold to ask: a contrary rule gives the luckless amputee an "advantage" over whom? Did the *Curtis Case* mean to announce some sort of rule of "turn-about-is-fair-play" in that since, fortunately, many injured workmen do recover and are able to return to work before the minimum number of weeks allowed for specific loss runs out that therefore those who do not should cheerfully accept their fate in order to roughly balance out a presumed inequity? Or did it mean to suggest that amputees possess some mysterious "advantage" over those unfortunate injured workmen who are denied the heady distinction and presumed aesthetic delight inherent in a neatly-executed surgical amputation? And in what way would a different rule have rendered section 10 "nugatory"? In what way would a different rule have given an unrecovered or disabled amputee an "advantage" over his brother workers who were hardy enough or fortunate enough to recover and return to work at the time or even before their minimum number of weeks had run out? How can any workman who cannot work ever possess any "advantage" over one who can?

These are some of the questions which we are afraid were not hinted at, much less grappled with, in the *Curtis Case.* Rather is it not true that under such a rule as there declared all the advantage lies instead with those injured workmen who are stubborn or better advised or lucky enough to refuse or escape amputation? Rather did not the *Curtis Case* itself, however unwittingly, in one swoop "amputate" an important area of the act and render it "nugatory"?

There is more to be said. We mean to cast no aspersion on a dedicated and hard-working medical profession when we suggest that such a rule does little or nothing to discourage employers and their

insurers from favoring a prognosis of early amputation. It also cannot help but compel some surgeons to at times feel not unlike reluctant commercial sculptors. That way, too, long and expensive therapy to save injured members may thus be avoided. And, as we have suggested, the rule of the *Curtis Case* tends likewise to encourage stubborn, brave— or well-advised—injured workmen to grin and bear it, and to cling at almost any cost in pain and suffering to their injured members for economic rather than medical reasons. None of this is healthy or good for anyone concerned, least of all for the injured employee. Thus Peter Van Dorpel in this case would have been economically better off if he would have grinned and borne it and, in his state of shock and confusion, refused or managed to avoid amputation of his crushed leg—just as, under the "hand" decisions of this Court, he would have been economically better off if the fateful steel girder which bore his name had struck his hand a few inches higher. Under the *Curtis Case,* too, he would have been better off if he had received in addition a slight concussion or strain or wrench or blow—or else dreamed one up; something, anything, to take the curse off his singular misfortune in merely neatly losing a leg and 4 fingers of his working hand, slick and clean, and then daring to come in and swear that that was all.

We can conceive of many situations in which the workman who receives injuries resulting in specific losses aggregating less than a statutory finding of total disability may in fact be totally disabled. Thus the piccolo player or tailor or night club pianist or anyone else who must normally use all his fingers may be forever out of business over the loss of a few of the wrong fingers (and yet fall far short of the statutory combination of declared total disability). Again that same individual may instead lose

both legs (thus gaining total statutory disability) and actually be able at an early date to go on with his usual work unperturbed. Now we do not mean to quarrel with the notion of statutorily declared minimums up to total disability, which has much to commend it; rather we seek to demonstrate that the only fair and sensible rule in cases of nonrecovery or inability to work following specific loss of members that may fall short of declared total disability is, as in all other cases, to inquire into the facts in each case: can the injured workman in fact continue to work and earn wages in the employment at which he was engaged when injured? (See *Levanen v. Seneca Copper Corporation,* 227 Mich 592, 601.)

As we have already noted, plaintiff not only seeks to distinguish the *Curtis Case* on its facts but to offer a rather novel distinction between that case and those—such as this one—where there are multiple specific losses resulting from a common accident. To such lengths has the *Curtis Case* driven imaginative and zealous counsel. We admire plaintiff's resource and appreciate his ingenuity, but we refuse to grasp at this shyly-proffered legal straw. In our view the ultimate question in this case and in all situations akin to this one is not—and never should be—whether the injured workman suffered one or a dozen specific losses. In our view the sole question in all of these cases should be: after the passage of the number of weeks allowed for the specific loss or losses falling short of declared total disability, can the injured workman go back to work? If he can—and fortunately he usually does—then well and good; if he cannot, and if there are competent proofs to support his claim of continuing disability, then his compensation should be continued. It is as simple as that, and we do not hesitate to brush aside those decided cases which hold or appear to hold to the

contrary, including at long last the unfortunate *Curtis Case.*

Such a construction as was made in the *Curtis Case* is to import into the act a rigidity and disregard for the common experience of mankind and the endless variety of jobs that men must perform to earn a living which we cannot believe the members of the legislature ever intended. We cannot believe that by section 10 a legislative body sitting in Lansing meant so cavalierly and irrevocably to separate the wounded industrial sheep from the goats; to appear to say so surely that the loss of so many inches or pounds of human flesh and gristle and bone shall entitle one man to one thing and no more, regardless of his condition and ability to work at the end of that time, and that the loss of so many other inches or pounds would entitle the next man to a finding of so many more weeks up to total disability, regardless of his original and subsequent condition and ability to work. Did the legislature mean to be lavishly liberal on the one hand and deliberately niggardly on the other? Or rather did it not there intend to consult broad industrial experience and lay down an irreducible minimum number of weeks allowable for certain common specific losses—thus removing the issue from costly and delaying litigation at a time when the workman was most helpless and his need the greatest—leaving the question of further disability and compensation to be determined on proofs made at a hearing in an orderly manner (in which the healed workman could be present and intelligently participate) in the light of his recovery or lack of it, having due regard for the nature and extent of the injuries, the then capacities and general condition of the workman, and the kind of a job he had before his injury? It is our educated guess that it meant the latter.

"The usual statute provides for both total disability and specific loss  *  *  *  without expressly saying that either shall be exclusive," Larson says beginning on page 45 of volume 2 of his work on workmen's compensation. "It could therefore be argued that, since the act must be given a liberal construction," he continues, "destruction of the more favorable remedy should not be read into the act by implication in a case where claimant is able to prove a case coming under either heading.  *  *  *  To refuse total disability benefits in such a case  *  *  * has the effect of ruling out the inability-to-get-work element in a listed group of injuries which just happen to take the form of a neatly classifiable loss of a member.  *  *  *  Logically there is no reason to make the distinction [whether total disability exists] turn on the physical extension of effects beyond the lost member.  *  *  *  The above reasoning was followed in *Cox* v. *Black Diamond Coal Mining Company* (E D Tenn), 93 F Supp 685, which disposed of the issue as a straightforward matter of statutory construction, there being 2 parallel benefits provided for uncomplicated loss  *  *  *  and the rule of liberal construction requiring that claimant be allowed the more favorable."*

In his conclusion the appellant argues forcefully and at length that legislative silence and inaction for 37 years after the *Curtis Case* amounts to a tacit recognition of its soundness by which we must irrevocably be bound. Now this beguiling doctrine of legislative assent by silence possesses a certain undeniable logic and charm. Nor are we oblivious to the flattery implicit therein; double flattery, in fact; flattery both to the profound learning and wisdom of the particular supreme court which has spoken, and flattery to a presumably alert and eagerly responsive

---

* 2 Larson, Workmen's Compensation Law, § 58.20, pp 45, 46.— REPORTER.

State legislature. One pictures the legislators of our various States periodically clamoring and elbowing each other in their zeal to get at the pearls of wisdom embalmed in the latest decisions and advance sheets of their respective supreme courts—and thenceforth indicating their unbounded approval by a vast and permanent silence.

Yet there are several dark shadows in this picture. For one, it suggests a legislative passion for reading and heeding the decisions of our supreme courts which we suspect may be scarcely borne out by the facts. For another, pushed too far such a doctrine suggests the interesting proposition that it is the legislatures which have now become the ultimate courts of last resort in our various States; that if they delay long enough to correct our errors those errors thus become both respectable and immutably frozen; and, finally, the larger and more dismal corollary that if enough people persist long enough in ignoring an injustice it thereby becomes just. We reject as both un-Christian and legally unsound the hopeless doctrine that this Court is shackled and helpless to redeem itself from its own original sin, however or by whomever long condoned.

Courts throughout the land have long split over this doctrine of legislative acquiescence by silence. The usual arguments for recognizing it are that it gives stability and sureness to the law; that "rights" thus acquired can thus only be disturbed at regular and predictable intervals by but one branch of the government, the legislative; and, finally, that to disregard the doctrine amounts to judicial legislating. Now we recognize that a court should not lightly overrule an interpretation of a statute that has been the law for 37 years, but we also see little justice or utility in continuing to give stability or sureness to an unfortunate rule of law; nor do we understand that employers or their insurance carriers have

gained any vested "rights" in the interpretation of this statute; nor do we think that the reinterpretation of a statute in the light of long experience with an unfortunate interpretation constitutes judicial legislating.

This case involves an interpretation of a statute which is silent on the precise issue involved. This Court 37 years ago decided what it thought the correct interpretation should be. We happen to disagree with that old interpretation and wish to make a new interpretation, for the reasons herein stated. It is suggested that we should not do this because, whether the original interpretation was right or wrong, inaction by the legislature since it was handed down constitutes a sort of informal post-enactment declaration of legislative assent thereto possessing the binding effect of law; and that any new and variant interpretation here and now would on that account constitute "judicial legislation."

To our mind the doctrine implicit in this kind of reasoning constitutes a surrender of the judicial function to a legislative body. In the final analysis the objection may fairly be stated thus: Our Court interprets a statute; whether right or wrong our decision henceforth becomes judicially immutable and we are powerless to change it; there is only 1 way it can be changed; if we are wrong we must wait for the legislature to tell us so; if by its long silence and inaction the legislature does not speak out and tell us we are wrong then it has perforce by the same token told us we are right; in any case this Court is forever fettered and powerless to reinterpret the statute in question. We have instead delegated that function to the legislature. This curious doctrine can be boiled down even more: right or wrong in the *Curtis Case,* we are helpless to change it.

Such a doctrine is to squarely place the legislature in the position of a super supreme court. We

also consider it an abdication of judicial responsibility. We reject such a doctrine flatly along with the sort of mechanistic thinking that can arrive at such an ironic impassé. This doctrine has irreverently been called the "one shot" theory of legislative interpretation. We ourselves brand it a Rip-Van-Winkle doctrine of judicial stagnation and inertia. We happen strongly to disagree with it and in this we are not alone.

Mr. Justice SMITH has had occasion to advert to this doctrine of legislative acquiescence by silence in his recent brilliant opinion in the *Sheppard Case* (*Sheppard* v. *Michigan National Bank,* 348 Mich 577 at 599, 600). We can best let him speak for himself with his characteristic eloquence and scholarship, thus:

"In shortest terms, bluntly put, the argument is that silence gives consent. It is suggested that we accord this catch phrase the dignity of a legal axiom. In its profundities, its cogency, its symmetry and its expression of fundamental truth, we are to find the answer to a complex question of statutory construction affecting the lives of thousands and our whole industrial economy. There is not a shred of justification therefor under these circumstances. Silence at best is ambiguous. Even in the law of evidence more than mere silence must be shown to impress upon the trier that silence was the equivalent of consent. See 4 Wigmore on Evidence (3d ed 1940), p 70; Lenhoff's Comments, Cases and Materials on Legislation, 816. It was Mr. Justice Rutledge, concurring in *Cleveland* v. *United States,* 329 US 14 (67 S Ct 13, 91 L ed 12), who put the matter in its proper setting (pp 22–24):

" 'Notwithstanding recent tendency, the idea cannot always be accepted that congress, by remaining silent and taking no affirmative action in repudiation, gives approval to judicial misconstruction of its en-

actments.  See *Girouard* v. *United States,* 328 US
61, 69 (68 S Ct 826, 90 L ed 1084).  It is perhaps
too late now to deny that, legislatively speaking as
in ordinary life, silence in some instances may give
consent.  But it would be going even farther beyond
reason and common experience to maintain, as there
are signs we may be by way of doing, that in legis-
lation any more than in other affairs silence or non-
action always is acquiescence equivalent to action.

"  'There are vast differences between legislating
by doing nothing and legislating by positive enact-
ment, both in the processes by which the will of con-
gress is derived and stated and in the clarity and
certainty of the expression of its will.  And there
are many reasons, other than to indicate approval of
what the courts have done, why congress may fail to
take affirmative action to repudiate their miscon-
struction of its duly-adopted laws.  Among them
may be the sheer pressure of other and more impor-
tant business.  See *Moore* v. *Cleveland R. Co.*
(CCA), 108 F2d 656, 660.  At times political consid-
erations may work to forbid taking corrective action.
And in such cases, as well as others, there may be
a strong and proper tendency to trust to the courts
to correct their own errors, see *Girouard* v. *United
States, supra,* at 69, as they ought to do when expe-
rience has confirmed or demonstrated the errors'
existence.' "

In *Bricker* v. *Green,* 313 Mich 218 (163 ALR 697)
(wherein this Court unanimously abandoned the old
doctrine of imputed negligence), we quoted approv-
ingly and at considerable length from Mr. Justice
Cardozo* on this broad general subject of a court
overruling its prior decisions.  We are aware that
he was not then speaking on our precise point of leg-
islative acquiescence, but his remarks are peculiarly
apt to our present problem, and we can see no basic
difference between a court overruling its former case
law and overruling its former interpretation of a

---

* The Nature of the Judicial Process, pp 142, 150.—REPORTER.

statute. Bad law no less ceases to be bad law, however the accident of its birth. We shall here content ourselves by taking just a portion from that long quotation (p 234):

"But I am ready to concede that the rule of adherence to precedent, though it ought not to be abandoned, ought to be in some degree relaxed. I think that when a rule, after it has been duly tested by experience, has been found to be inconsistent with the sense of justice or with the social welfare, there should be less hesitation in frank avowal and full abandonment."

Justice Cardozo then in turn quotes approvingly from a Connecticut case,* there cited:

" 'That court best serves the law which recognizes that the rules of law which grew up in a remote generation may, in the fullness of experience, be found to serve another generation badly, and which discards the old rule when it finds that another rule of law represents what should be according to the established and settled judgment of society, and no considerable property rights have become vested in reliance upon the old rule. It is thus great writers upon the common law have discovered the source and method of its growth, and in its growth found its health and life. It is not and it should not be stationary. Change of this character should not be left to the legislature.' "

Justice Cardozo then concludes:

"If judges have woefully misinterpreted the *mores* of their day, or if the *mores* of their day are no longer those of ours, they ought not to tie, in helpless submission, the hands of their successors."

In *Arrow Builders Supply Corp.* v. *Hudson Terrace Apartments, Inc.* (1954), 15 NJ 418, 426 (105

---

\* *Dwy* v. *Connecticut Co.*, 89 Conn 74, 99 (92 A 883, LRA1915E, 800, Ann Cas 1918D, 270).—REPORTER.

A2d 387), Mr. Justice Jacobs had this to say about the doctrine of legislative acquiescence by silence, an opinion in which, incidentally, he was joined by Chief Justice Vanderbilt and by Mr. Justice Brennan, presently of the United States supreme court:

"We are satisfied that the construction of section 3 in the *Hegeman-Harris Case** unduly restricted the legislative objectives; indeed, the brief of the respondent in the instant matter takes no position to the contrary. Instead it confines itself to the argument that since the decision in *Hegeman-Harris* was rendered over 30 years ago and no explicit legislative action has been taken to nullify it, this court should now reaffirm it as the law of the State. * * * Its contention rests entirely on the concomitant principles of *stare decisis* and legislative acquiescence in the judicial interpretation of statutes. To the extent that these principles afford measures of stability and predictability in our legal system they are of great social value. They undoubtedly dictate the view that adherence to precedent 'should be the rule and not the exception.' Cardozo, The Nature of the Judicial Process, p 149 (1921). But they are not absolutes and under cogent circumstances they must give way to overriding considerations which recognize that the purpose of our legal system is to serve justly the needs of present day society and, to that end, judges remain free to re-examine earlier determinations and correct judicial errors whether they be their own or those of their predecessors. In a lecture delivered before the Association of the Bar of the City of New York, Justice Douglas had occasion to collect the significant number of cases in which the United States supreme court has expressly overruled precedents; included were 5 recent instances which involved the discarding of earlier statutory interpretations. See Douglas, Stare Decisis 20 (1949). Similarly, this court has, on several occa-

---

* *George A. Mills Co.* v. *Hegeman-Harris Co.,* 94 NJ Eq 802 (125 A 127).—REPORTER.

sions within the past 5 years, been called upon to overrule earlier decisions, some of which embodied erroneous statutory interpretations. [Citing many cases.]"

The court then refers to and quotes from a 1950 New Jersey case, there cited* as follows (p 427):

"It is urged on us that the construction put on the statute by the *O'Connor Case*† became a part of the statute which we may not change, that power residing solely in the legislature. However this rule of legislative acquiescence in the well-settled interpretation of a statute is but one of several principles that may guide a court in arriving at the true meaning of a legislative act. It is no more than an aid in statutory construction and it is merely one factor in the total effort to give meaning to the language of the statute. Moreover, it has been held that 'one decision construing an act does not approach the dignity of a well-settled interpretation,' *United States* v. *Raynor* (1938), 302 US 540, 552 (58 S Ct 353, 358, 82 L ed 413, 420). The doctrine here contended for is not uniformly controlling; it must not be permitted to fetter the courts in their search for light. The principle of *stare decisis* which lies behind the doctrine is entitled to respect, but it must not blind us to realities; it is not an idol to be worshipped in following either a judicial precedent or an antecedent statutory construction."

Finally we refer but briefly to the already historic recent decision in *Brown* v. *Board of Education of Topeka,* 347 US 483 (74 S Ct 686, 98 L ed 873, 38 ALR2d 1180) (the school desegregation case) wherein the United States supreme court held that the "separate but equal" doctrine long ago adopted in *Plessy* v. *Ferguson,* 163 US 537 (16 S Ct 1138, 41 L ed 256) no longer had any place in the field of public education (p 495). Between those 2 decisions

---

* *Pennsylvania-Reading Seashore Lines* v. *Board of Public Utility Com'rs,* 5 NJ 114 (74 A2d 265).—REPORTER.

† *O'Connor* v. *Board of Public Utility Com'rs,* 129 NJL 263 (29 A2d 390).—REPORTER.

the Constitution had not changed.    Nothing had changed but the hearts and minds of men.

A little sense of proportion and realism in this area might not be amiss.    The plain fact is that courts of last resort everywhere constantly engage in a form of "judicial legislating" when they are confronted—as they so often are—by statutory or other provisions of ambiguous or uncertain meaning. Such judicial interpretations often in effect add words to a statute.    Must we act at our peril that we might possibly be wrong?    Some judges solemnly declare that we must.    Yet far from being the doctrine of humility and keeping our places that they would have it appear, is not this essentially to preach the gospel of judicial infallibility?    Scarcely a term of this Court passes that all of us are not obliged to interpret unclear statutes.    Occasionally we must reinterpret them.    It is one of our primary functions; that's what we are here for.    It is only when a judge ignores or flies in the face of a positive and unambiguous statutory enactment that he may justly be accused of judicial legislating, in the bad sense. That is not our case.

No living man can possibly measure the amount of poverty and pain and human indignity suffered by Michigan workmen and their families because of the unfortunate *Curtis Case*.    It has lain across the jugular vein of workmen's compensation far too long.    Rather than attempt to distinguish that case —as we are aware we might—we prefer to sweep away the last vestiges of the *Curtis Case* and at long last align Michigan squarely behind the more modern and liberal decisions which refuse to limit workmen's compensation benefits to the scheduled allowance.    We believe it is time for the *Curtis Case* to go.

In the final analysis we have here—as Larson has pointed out—a situation where the legislature has not clearly expressed its intent.    It is unfortunate

that the highest court in one of the greatest industrial States in the nation should 37 years ago have adopted a narrow construction of that unexpressed intent. We have long conceived the workmen's compensation acts to be one of the great pioneer landmarks in humanitarian social legislation in the Anglo-American world. In the bold sweeping away of ancient legal cobwebs and in the grandeur of its concepts and declared purposes these acts were almost as revolutionary, in their way, as was the surging Industrial Revolution itself that preceded their inevitable birth. These acts set the pace and led the way for much salutary social legislation that followed. It is not too much to say that they charted a whole brave new legal world.

In our view it should go almost without saying that as new interpretative issues should arise judicially under these acts all fair and reasonable doubts should be resolved in favor of upholding the basic purposes of the legislation, in this case compensating in some measure the broken and injured workman who cannot work.

Our respect for our predecessors who sat here during the initial interpretative years of our workmen's compensation act is enhanced rather than diminished by the convictions here expressed. Were they yet here, men of such stamp undoubtedly would be among the first to renounce "a doctrine of disability of self-correction" ("This Court, unlike the House of Lords, has from the beginning rejected a doctrine of disability at self-correction." *Helvering* v. *Hallock,* 309 US 106, 121 [60 S Ct 444, 84 L ed 604, 125 ALR 1368].) and the first to announce their willingness to consider a contention that they may have possibly erred on an earlier occasion. Indeed, Mr. Justice NELSON SHARPE, writer of the opinion in the *Curtis Case,* did not hesitate to join in an historic and far-reaching reversal of that which he had twice

attested in earlier years. (Compare *Kavanaugh* v. *Rabior,* 222 Mich 68; and *Kavanaugh* v. *Baird,* 241 Mich 240 with *Hilt* v. *Weber,* 252 Mich 198 [71 ALR 1238].) If the present situation calls for a declaration of fealty to the great works of these men, we hereby declare it—along with the prayer that our errors in future years may be as few as theirs.

In view of our decision we shall not consider the interesting companion question whether recovery might have been had here under section 10 for the combined loss of a leg and a hand. The award of the appeal board is affirmed, with costs. The appellant should of course have credit for compensation already paid.

SMITH, EDWARDS and BLACK, JJ., concurred with VOELKER, J.

SHARPE, J. (*for reversal*). It is conceded that plaintiff's injury arose out of and in the course of his employment, and as a result of this injury plaintiff suffered a loss of the 4 fingers of his right hand and the loss of his right leg by amputation just above the knee. It does not appear that plaintiff has suffered any conditions beyond the specific losses suffered in the accidental personal injury on December 22, 1948.

It appears that defendant insurance company paid plaintiff compensation of 100 weeks for the loss of his 4 fingers and 200 weeks for the loss of his right leg, as is provided in part 2, § 10 of the workmen's compensation act, the amount of $6,300 for the specific losses sustained. At the conclusion of the 300-week period plaintiff appealed for further compensation, which was granted April 13, 1956, and provided that compensation should not exceed 750 weeks from the date of injury.

Upon leave being granted, defendants' appeal and urge that plaintiff having been paid for specific losses under CL 1948, § 412.10 (Stat Ann 1947 Cum Supp § 17.160) of the act, he is not entitled to further compensation as is provided under CL 1948, § 412.9 (Stat Ann 1947 Cum Supp § 17.159). It should be noted that part 2, § 9 of the act, provides for compensation for total incapacity, while section 10 provides for enumerated specific losses of members of the body. The precise legal question in the case at bar was before this Court in *Curtis* v. *Hayes Wheel Co.,* 211 Mich 260. In that case plaintiff suffered an industrial injury, necessitating the amputation of his left foot 4 or 5 inches below the knee. He was paid compensation for the specific loss as was provided in section 10 then in effect. He sought additional compensation, claiming total incapacity under section 9 of the act. We there said (pp 264, 265):

"This leads to a careful consideration of the several provisions of sections 9 and 10, part 2, of the act (CL 1915, §§ 5439, 5440, as amended by PA 1919, No 64). Section 9 provides for compensation in cases where the incapacity for work is total. Applicant is entitled to recover under it until the time when his foot was amputated. Thereafter his claim comes under the provisions of section 10 which specifically allows 'For the loss of a foot, 60% of average weekly wages during 125 weeks.' As soon as the amputation was performed, he became disabled by the loss of his foot. He suffered no other injury than that which resulted in the amputation. As the act *provides specific compensation for the loss of a foot, we are of the opinion that all liability of defendants ceased when payment was made for the full term of 125 weeks. These specific items of compensation fixed by the act must control when no other disability than such as results from the removal of the member exists.* To hold otherwise would, so

far as the employer is concerned, render this provision nugatory and of no effect. Should the employee recover from the effects of the amputation in a few weeks and be able to resume his employment, the payments secured to him on account thereof are in no way affected but continue during the term fixed. To hold that when his recovery is not fully completed at the expiration of the stated term he may present a claim for further compensation under section 9, would give him an advantage not contemplated in the act. As before stated, the applicant is entitled to recover for total disability up to the time when his foot was removed and, there being no claim of disablement other than that incident to such removal, payment for 125 weeks thereafter.   *   *   *

"Insofar as it seemed possible, the act makes the allowance certain. The degree and duration of the disability and the weekly earnings of the injured party must be determined as matters of fact by the board. *When the disability is due to the lack of a member, the act relieves the board of determining its extent and specifically fixes the period for which compensation shall be paid. Should the injured party be unable to resume his employment at the expiration of such period, he is but in the same condition as one who has received an allowance for total disability, after the maximum amount provided therefor has been paid.*

"The conclusion reached is but that stated by Mr. Justice STEERE in *Addison* v. *W. E. Wood Co.*, 207 Mich 319. We might have contented ourselves with a reference to that decision, but the question here presented was not therein directly involved. The case of *Limron* v. *Blair*, 181 Mich 76 (5 NCCA 866), relied on by counsel for applicant, is distinguished in the *Addison Case*. If it can be said to state a rule of construction at variance with the views herein expressed, it is to that extent overruled." (Emphasis supplied.)

See, also, *Stackhouse* v. *General Motors Corp.*, 290 Mich 249; *Clements* v. *Chrysler Corp.*, 321 Mich 558.

Mr. Justice Voelker admits that the *Curtis Case* must be overruled if plaintiff is to receive compensation under section 9 of the act. I shall not attempt to answer the reasoning used by Mr. Justice Voelker, except to say that it is a desire to give plaintiff double compensation contrary to the statute. It has been 37 years since the *Curtis Case* was decided. We must assume that the legislature was and is aware of that decision, yet no action has been taken since by the legislature to amend the compensation law to give effect to what Justice Voelker is attempting to do in this case. We must conclude that the legislature is satisfied with our interpretation of the statute as outlined in the *Curtis Case.*

There are 3 departments of government in Michigan—the executive, the legislative, and the judicial. It is an accepted principle of law that no department of government should encroach upon the duties and responsibilities of another department. It is the duty of the legislature to enact such laws as it deems best for the people of this State. It is the duty of the judicial branch of the government to interpret the laws enacted by the legislature. We should not attempt judicial legislation.

I conclude this opinion by stating that if plaintiff is to recover in this case he must point out with reasonable certainty the law that gives him a valid claim. It cannot be done in the case at bar. Moreover, if the law needs changing, then such action should be taken by the legislature.

The award should be vacated, with costs.

Dethmers, C. J., and Kelly and Carr, JJ., concurred with Sharpe, J.