THE STATE OF OHIO *v.* THE CLEVELAND & PITTS-BURGH RAILROAD CO. ET AL.

*Navigable waters — Control and power of federal government — Title to and rights in subaqueous soil under Lake Erie — Title in state as trustee — Control by state of harbor within harbor lines — Littoral owner may wharf out, when — Rights of state, public and littoral owners.*

1. Under the constitutional grant of authority to regulate inter-state and foreign commerce, the United States government has paramount control of navigable waters and power to establish therein harbor lines and regulations.

2. The title and rights of littoral and riparian proprietors in the subaqueous soil of navigable waters, within the limits of a state, are governed by the laws of the state, subject to the superior authority of the federal government.

3. The title of the land under the waters of Lake Erie within the limits of the state of Ohio, is in the state as trustee for the benefit of the people, for the public uses to which it may be adapted.

4. The state has control of a harbor within a harbor line and may enact legislation prescribing regulations in connection there-with and to secure the rights of the public, provided it does not conflict with the regulations of the federal government.

5. The littoral owner is entitled to access to navigable water on the front of which his land lies, and, subject to regulation and control by the federal and state governments, has, for pur-poses of navigation, the right to wharf out to navigable water.

6. The ownership of the waters of Lake Erie and of the land under them within the state is a matter of public concern. The .trust with which they are held is governmental, and the state, as trustee for the people, cannot by acquiescence or otherwise abandon the trust property or permit a diversion of it to private uses different from the object for which the trust was created. The littoral owner is charged with knowledge that nothing can be done by him that will destroy the rights of the public in the trust estate.

(No. 14825 — Decided February 29, 1916.)

ERROR to the Court of Appeals of Cuyahoga county.

This was a proceeding brought in the court of common pleas of Cuyahoga county by the state against The Cleveland & Pittsburgh Railroad Co., The Lake Shore & Michigan Southern Railway Co., The Pennsylvania Co. and The New York Central Railroad Co.

The petition alleges that the defendants are the owners of certain lands, forming a contiguous tract, having a frontage of about 1,415 feet on the south shore of Lake Erie, just west of the mouth of the Cuyahoga river where it enters the artificial harbor created by the United States government breakwater.

It is averred that all of the land covered by the waters of Lake Erie within the boundaries of the state of Ohio, and especially that part of such land constituting the bed of said waters contiguous to the above-described tracts of land, is owned by the state of Ohio as proprietor thereof, subject to the common-law rights of the defendants and the gen-

eral public to the use of the waters over said land for the purposes of navigation and fishery.

It is averred that within a period of about six months previous to the filing of the petition the defendants had been filling in the waters of the harbor in front of their land and had proceeded with the fill along said frontage out from the shore for a distance of from 15 to 165 feet; that the territory so filled had been in the past and was still being used as the anchorage for considerable of the water craft using said harbor of the city of Cleveland and that the effect of the fill and threatened filling will be to prevent or limit such use thereof in the future and to limit the space available in said harbor as a refuge harbor for the water craft of the lake and an anchorage for all craft using said harbor, including log rafts, as it has been used, is now being used and will be more extensively used in the future.

The petition alleges that the submerged territory in front of the defendants' lands is owned by the state of Ohio as proprietor thereof and that defendants are filling up the waters of Lake Erie without any grant of right to do so from the government of the United States, or the state of Ohio or from any person, officer or corporation vested with any right or authority to grant such privilege.

The prayer of the petition is for an injunction to stop further filling and that the defendants be ordered to restore the waters to their original condition.

The defendants in their answer for a first defense admit their ownership of the uplands, the fill-

ing in as alleged in the petition and deny the other allegations in the petition.

For a second defense they allege the establishment by the United States government of a harbor line, previous to September, 1910, about 1,000 feet out in the harbor in front of the uplands of defendants, and that the territory between the shore line and the harbor line was shallow and nonnavigable.

They further aver that in order to avail themselves of the riparian rights vested in them by reason of the ownership of the tracts of land above mentioned, abutting on the shore of said lake, it is necessary to fill in upon the bed of said lake in order to wharf out to said harbor line and thereby reach navigable water; that the distance between the present shore line and said harbor line is so great that it is impracticable, as well as impossible, for said defendants to place themselves in a position where they may be able to avail themselves of and enjoy the use of said riparian rights in connection with the navigable waters of said lake without so wharfing out by filling in upon the bed of the lake.

For a third defense they aver that, with the knowledge and acquiescence of the state, adjoining owners of property had made fills which had caused the water in front of defendants' uplands to become more shallow and had caused deposits of sand in bars upon the bed of said lake in front of defendants' property, thereby making it impossible to use the waters of said lake immediately in front of said defendants' tracts, or at any point inside of the established harbor line, for the purpose of navigation.

Statement of the Case.

For a fourth defense it is alleged that since a very early period in the history of the city of Cleveland, to-wit, 1845, there had existed a custom for property owners and the city to make fills along the shore of the harbor of the city of Cleveland to the knowledge and with the acquiescence of the authorities of the state of Ohio; that under favor of said custom certain railroad companies created what is known as the "Bath Street Tract," lying immediately east of the easterly pier of the Cuyahoga river at said harbor, consisting of an area of upwards of eighty acres of land; that said property has been extended to the harbor line established by the United States government; that millions of dollars have been expended in the construction thereon of slips, docks, loading and unloading plants for coal and iron ore, warehouses, depots and track facilities; that the city of Cleveland, acting under favor of riparian rights, has filled in upon the bed of said lake until it has reclaimed from said lake upwards of fifty to sixty acres of land; that said custom was well known to the authorities of the state of Ohio and that they never raised any objection or made any claim that the bed of the lake was owned by the state or that any filling in thereon was a trespass.

For a fifth defense it is alleged that transportation facilities in and out of said city of Cleveland are inadequate to properly handle the traffic, for the reason that the tonnage of raw material and merchandise has increased with such rapid strides during recent years as to make it impossible for

railroads to keep pace with the same, and that the city of Cleveland and the corporations whose lines of railroad center there have in contemplation joint improvements involving extensive changes in the handling of traffic in and out of the city, both by rail and boat; that the contemplated improvements will require a change in the present bridge over the Cuyahoga river and the construction of a second bridge across said river and the filling in of the bed of the lake from the shore to the harbor line. They allege that the filling now being prosecuted is to meet the present needs of the defendants and in view of the more extensive changes contemplated. They allege that in the filling in upon the bed of the lake they are only doing that which the great needs of the public demand at the Cleveland harbor and improving their property through the exercise of their riparian rights so as to enable them to meet the demands of the public and discharge their duties as common carriers.

The state in its reply admits the establishment of the harbor line by the United States government along a part of the water frontage of Cleveland, including the particular upland in question, and that certain littoral owners, including the city of Cleveland, had made certain fills, but alleges that all of said fills had been made without notice to or consent of the state, and further alleges that the filling done by the city of Cleveland was not with any intention of claiming any interest adverse to the plaintiff, but was for the protection and benefit of the rights of the public generally.

The plaintiff further admits that there is a demand at the port of Cleveland for increased dockage and other transportation facilities and that such demand has been the subject of much discussion between the defendants and the representatives of the city of Cleveland and civic organizations of said city involving numerous plans, but that no general or particular plans have yet been decided upon and at no time has the interest of the city or public sought by this suit to be protected been overlooked, nor has any plan contemplated by the city involved the surrender of the control of the territory here in question.

At the close of the state's case the trial court sustained a motion of the defendants that the petition of the plaintiff be dismissed and judgment be rendered for the defendants. The court of appeals affirmed this judgment, and this proceeding is brought to reverse the judgments of the courts below.

*Mr. Edward C. Turner,* attorney general; *Mr. Clarence D. Laylin* and *Mr. Robert M. Morgan,* for plaintiff in error.

*Messrs. Squire, Sanders & Dempsey; Mr. Samuel H. West; Mr. William C. Boyle; Mr. William L. Day* and *Mr. W. L. Fleming,* for defendants in error.

JOHNSON, J. The federal government, under the constitutional grant of authority to regulate interstate and foreign commerce, has power to establish harbor lines in navigable waters. In the

exercise of that power it did establish a harbor line in Lake Erie about 900 feet out from the shore in front of defendants' land. The defendant companies and other littoral proprietors have made extensive fills and wharves between the shore and the harbor line.

The contention of the plaintiff is that the state is the absolute owner of the subaqueous land between the shore and the harbor line, and that the littoral owner has no right to wharf out, either by filling in or otherwise, to reach navigable water. It is contended that this is the rule fixed by the English common law, which it is claimed prevails in Ohio.

The defendants concede that the title to the submerged land is in the state, not as absolute proprietor but as trustee for the public in the protection of navigation and fisheries, subject to the paramount right of the federal government in the regulation of navigation.

They claim that incident to the ownership of the upland the littoral owner has a right to wharf out to navigable water, and that this is a property right which cannot be taken from him under the constitution without compensation. They insist that where the United States government establishes a harbor line it fixes at that point navigable water, and the right exists in the owner of the foreshore to wharf out, by filling in or otherwise, over the shallow waters between the shore and the harbor line in order to reach the point of navigability thus established.

It is well settled that the title and rights of riparian and littoral owners in the subaqueous soil

of navigable waters within the limits of a state are governed by the laws of the state, subject to the paramount rights of the government of the United States. There has been no general legislation by the state of Ohio regulating the construction of wharves.

Impressed with the importance of the subject, counsel have submitted able and exhaustive briefs on the question. They disclose a wide diversity of view as to public and private rights in subaqueous land below the high-water mark of navigable waters. It may be safely said that there is scarcely any question which has caused greater conflict of opinion or produced more diverse results than that relating to the title of land under water. In many instances different conclusions have been arrived at in the same jurisdiction under various circumstances. Courts have differed in the method of reasoning as well as the grounds upon which they have arrived at their conclusions.

Counsel for the state insist that by the common law of England the littoral owner has no right to wharf out under such circumstances as are found in this case, and that in the absence of statutory or constitutional provisions to the contrary that law applies in Ohio. We think that the latter proposition, as stated, is too broad. There has been full recognition of our indebtedness to the English common law as the fundamental source of our system of jurisprudence, but our courts have realized that it is not in *all* cases suitable to our institutions and our circumstances.

It has been repeatedly determined by the courts of this state that they will adopt the principles of the common law as the rules of decision so far only as those principles are adapted to our circumstances, state of society, and form of government. *Lessee of Lindsley* v. *Coats,* 1 Ohio, 243.

In *Bloom* v. *Richards,* 2 Ohio St., 387, Judge Thurman spoke for the court: "The English common law, so far as it is reasonable in itself, suitable to the condition and business of our people, and consistent with the letter and spirit of our federal and state constitutions and statutes, has been and is followed by our courts, and may be said to constitute a part of the common law of Ohio. But wherever it has been found wanting in either of these requisites, our courts have not hesitated to modify it to suit our circumstances, or, if necessary, wholly to depart from it."

In *The C., C. & C. Rd. Co.* v. *Keary,* 3 Ohio St., 201, Judge Ranney declared: "We profess to administer the common law of England, in so far as its principles are not inconsistent with the genius and spirit of our own institutions, or opposed to the settled habits, customs, and policy of the people of this state, thereby rendering it inapplicable to our situation and circumstances."

The strict rule of the common law of England which deprived the littoral and riparian owner of the right to wharf out and which originated in the time of the Stuarts has been much relaxed in Great Britain.

In *Buccleuch* v. *Metrop. Bd. of Works,* L. R., 5 H. L., 418, decided in 1872, there was a material

modification of the original rule, made in favor of
the riparian owner. In that case the right of access
was held to belong to the riparian owner, as also
in *Lyon* v. *Fishmongers' Co.,* L. R., 1 App., 662,
decided in 1876.

In this country many courts have pointed out the
differences in our situation from that in England
which prevent the application of the strict rule of
the common law.

For example, in *Bell* v. *Gough,* 23 N. J. Law
(3 Zab.), 624, it is said, at page 669: "Indeed it is
doubtful if any of the states recognize the doctrines
of the common law of England on the subject of
rivers and other waters precisely as they are held
there. Those doctrines grew out of a state of
things and of usages different from ours, and can-
not be literally applied to circumstances so ma-
terially different as those found to exist in the
United States."

In *Shively* v. *Bowlby,* 152 U. S., 1, Mr. Justice
Gray instructively develops the learning on the
subject. He sets out a very complete history of the
growth of the law in England and in the United
States. He begins with a review of the treatise
"De Jure Maris," written by Lord Chief Justice
Hale, who is conceded to be the great authority in
the law of England on this subject. The English
common-law rule, as above stated, is set out in the
opinion, as well as the modification made in
*Buccleuch* v. *Board of Works, supra.* Mr. Justice
Gray also reviews at great length decisions in the
different courts of the United States. It is wholly
unnecessary to here refer to those cases in detail.

The court concluded that at common law the title and the dominion in lands flowed by the tide were in the king for the benefit of the nation; that upon the settlement of the colonies like rights passed to the grantee in the royal charters, in trust for the communities to be established; that upon the American Revolution these rights, charged with a like trust, were vested in the original states within their respective borders, subject to the rights surrendered by the constitution to the United States; that the new states admitted into the Union since the adoption of the constitution have the same rights as the original states in the tide waters, and in the lands under them, within their respective jurisdictions, and that the title and rights of riparian or littoral proprietors in the soil below high-water mark, therefore, are governed by the laws of the several states, subject to the rights granted to the United States by the constitution.

The court held that the question of the use of the shores by the owners of uplands was left to the sovereign control of each state, subject only to the rights vested by the constitution in the United States. The right to wharf out was denied in that case, because of the law of Oregon, where the case arose.

In *Illinois Central Rd. Co.* v. *Illinois,* 146 U. S., 387, in which there is also a very interesting discussion of the same questions, it was held that the ownership of the soil in Lake Michigan is in the state, and that the riparian proprietor is entitled to access to the navigable part of the water on the front on which lies his land and for that purpose to make a

landing, wharf or pier for his own use or for the use of the public.  Such right terminates at the point of navigability.

The courts of Illinois, however, have finally declared that the common-law rule controls there. They hold that ownership on the shore of Lake Michigan extends only to the water's edge; that the only right the owner has is the right of access to the waters of the lake, and that he has no right to build piers or to wharf out. *Revell* v. *People,* 177, Ill., 468, and *Commrs.* v. *Fahrney,* 250 Ill., 256.

The ground upon which the right to wharf out is put, in the cases sustaining the right, is that it is an aid to navigation and to the advancement of commerce.

In 1 Farnham on Water and Water Rights, 521, the author says: "Although the primary purpose of a water way is for navigation, yet that is merely one element of the combined whole which is necessary to constitute commerce, and must be held subordinate to it.  If navigation is held supreme, the very purpose for which it exists may be defeated by its own demands.  Therefore, since commerce is the thing which is supreme, and navigation merely an aid to it, navigation must accord to commerce the right to satisfy its own needs, and must permit the erection of such wharves and piers in the spaces which are naturally available for navigation as are necessary to facilitate the interchange of commerce.  These rights must, however, be exercised so as not to interfere needlessly with the right of navigation.  Both rights exist, and each is necessary to the other.  *  *  *  When it is

said that the water ways are held in trust for the benefit of the people, and must be kept open for the benefit of navigation, it is not meant that the erection therein of structures which are absolutely necessary to navigation is to be prohibited, because by such interpretation the execution of the trust would defeat the very purpose for which it was established. As said in *Atlee* v. *Northwestern Union Packet Co.* [21 Wall., 389], wharves and piers are almost as necessary to the successful use of the stream in navigation as the vessels themselves, and are to be considered as an important part of the instrumentalities of this branch of commerce."

In *Sloan* v. *Biemiller,* 34 Ohio St., 492, the court considered the rights of littoral owners on Lake Erie and its bays and held that there was no exclusive right of fishery vested in the littoral proprietors, but that such waters were as open to the public for fishing purposes as though they were subject to the ebb and flow of the tides. The court expressly state in the opinion that it was not required to consider any question in regard to the right of a riparian owner to build out beyond his strict boundary line, for the purpose of affording such convenient wharves and landing places in aid of commerce as do not obstruct navigation; but Judge White remarks, at page 513: "It was held in *Dutton* v. *Strong,* that these rights of the riparian owner apply to the lakes as well as to tide waters. 1 Black, 23. See also *Austin* v. *Rutland R. R. Co., supra,* 25 Vt. 215."

With reference to the nature of the title of the state to the subaqueous land of Lake Erie, this is said: "And although the dominion over and the right of property in the waters of the sea and its inland waters were, at common law, in the crown, yet they were of common public right for every subject to navigate upon and to fish in, without interruption. Id. [Angell on Tide Waters], 21. They were regarded as the inherent privileges of the subject, and 'classed among those public rights denominated *jura publica,* or *jura communia,* and thus contradistinguished from *jura coronae,* or private rights of the crown.' Id. 22, 80; Harg. Law Tracts, 11. The sovereign was the proprietor of these waters, as the representative or *trustee* of the public. In this country the title is vested in the states *upon a like trust,* subject to the power vested in congress to regulate commerce. *Martin* v. *Waddell,* 16 Peters, 367, 412; *McCready* v. *Virginia,* 94 U. S. (4 Otto), 391."

In *Dutton et al.* v. *Strong et al.,* 1 Black, 23, *supra,* it is said, at page 32: "Our ancestors, when they immigrated here, undoubtedly brought the common law with them, as part of their inheritance; but they soon found it indispensable, in order to secure these conveniences, to sanction the appropriation of the soil between high and low-water mark to the accomplishment of these objects."

In New York a rule seems to have been finally determined in the case of *Brookhaven* v. *Smith,* 188 N. Y., 74. In this case it was held that a riparian owner whose land is bounded by navigable waters has the right of access thereto from the

front of his lot, and such right includes the construction of a pier on the land under water, beyond high-water mark, for his own use or for the use of the public, *subject* to such general rules and *regulations as congress* or the *state legislature* may prescribe for the protection of the rights of the public, although under the common law of England such structure is regarded as a purpresture or an unlawful encroachment upon the rights of the sovereign, and subject to removal at his pleasure. It is also held that an owner of upland adjoining Great South Bay has a right of access to the waters thereof from the front of his lot, and such right includes the construction of a pier on the land under water beyond high-water mark, for his own use or the use of the public, without the consent of the town of Brookhaven, which acquired the title in fee to such land under royal grant in 1666, 1686 and 1693, although at that time, under the common law of England, riparian owners had no such right, and such structure, in the absence of license therefor, was a purpresture and subject to removal at pleasure.

In the opinion the court say, at page 79:

"The adoption by the people of this state of such parts of the common law, as were in force on the 20th day of April, 1777, does not compel us to incorporate into our system of jurisprudence principles, which are inapplicable to our circumstances and which are inconsistent with our notions of what a just consideration of those circumstances demands. The common law of England, upon the subject of the rights of riparian owners, has but an

imperfect application to the situation in a state like this, with its numerous large navigable bodies of waters, in bays, rivers and inland lakes."

However, since the decision in the *Brookhaven case* the New York court of appeals in *Barnes* v. *Midland Rd. Term. Co.,* 193 N. Y., 378, has distinctly held that the riparian owner must exercise his right reasonably and so as not to unnecessarily interfere with public passage. It is held that to this extent "defendant's rights are superior to all others *save those reserved to congress* and the *state legislature.*"

After a careful examination we are convinced that in most of the states of the United States the conclusion has been arrived at, either by judicial reasoning or by statutory provision which has been upheld, that, subject to regulation and control by the federal and state governments, the littoral owner has the right to wharf out to navigable waters, provided he does not interfere with the public rights of navigation or fishery, and that the state holds the title to the subaqueous land of navigable waters as the trustee for the protection of the public rights therein. Piers and wharves are a necessary aid to navigation, as much so as the harbor itself, and the right to construct them is as important and essential. Without them the operations of commerce would be seriously weakened. If they are to be useful these piers must extend into water of sufficient depth to float loaded vessels. The littoral owner has an undoubted right of access to the water, and if this right is to be of value it must be such access as will enable him to

reach *navigable* water and to do the things necessary to that end.   Courts in ascertaining and declaring these rights must regard the object for which they are conferred.   In this case that object is to aid the commerce of the lake and develop the business of the country.

It is matter of common knowledge that vast quantities of iron ore are brought from ore beds in northern Michigan and Minnesota to ports in Ohio on Lake Erie, and that this ore is an essential element in making that general neighborhood one of the great iron-producing sections of the country. These conditions, in connection with the other great manufacturing and commercial enterprises of that section, create a situation which invokes the exercise of every legitimate energy in aid of commerce.

But it is contended on the other hand, with much earnestness and, it must be conceded, with much force, that piers and wharves may be extended into the harbor in such a manner and may be constructed and used in such a way as to occupy all the space and to practically destroy the harbor. It is pointed out that wharves and piers having been made by fills or otherwise may then be diverted to private uses, wholly disconnected from navigation, and thereby hinder and interfere with navigation itself.

It is manifest that there must be some governmental power to exercise such control and make such regulations as will secure the rights of the public and prevent interference with navigation.

As shown, the state holds the title to the sub-aqueous land as trustee for the protection of public rights. The power to prescribe such regulations resides in the legislature of the state.

When, as in this case, the United States government has fixed a harbor line, the state has power to regulate navigation and fishing between that line and the shore, provided its regulations do not conflict with those of the general government. Our general assembly has enacted no legislation providing such regulations.

Until the enactment of appropriate legislation the littoral owner, for the purposes of navigation, should be held to have the right to wharf out to the line of navigability, as fixed by the general government, provided he does not interfere with public rights. Otherwise, through the mere absence of legislation by the state, the supreme utility and value of navigable waters — navigation and commerce — would be defeated. Whatever he does in that behalf is done with knowledge on his part that the title to the subaqueous soil is held by the state as trustee for the public, and that nothing can be done by him that will destroy or weaken the rights of the beneficiaries of the trust estate. His right must yield to the paramount right of the state as such trustee to enact regulatory legislation. It must be remembered that his right, pending appropriate legislation, is one that can be exercised only in aid of navigation and commerce, and for no other purpose. What he does is, therefore, in furtherance of the object of the trust and is permitted solely on that account.

The state as trustee for the public cannot by acquiescence abandon the trust property or enable a diversion of it to private ends different from the object for which the trust was created.

If it is once fully realized that the state is merely the custodian of the legal title, charged with the specific duty of protecting the trust estate and regulating its use, a clearer view can be had.

An individual may abandon his private property, but a public trustee cannot abandon public property. Mere nonuser of the trust property by the public cannot authorize the appropriation of it by private persons to private uses and thus thwart the purposes of the trust.

In *The L. & N. Rd. Co.* v. *City of Cincinnati,* 76 Ohio St., 481, it is held that public streets, squares, *landings* and grounds are held in trust for the public, and that it is not in the power of the legislature, unless in the exercise of the power of eminent domain, to authorize property, dedicated to the public for a specific purpose, to be used for a purpose inconsistent with the purpose for which it was dedicated. Estoppel was pleaded in that case, but was not sustained. On page 507 it is said: "There being an entire absence of power to make the grant, there is no room for an estoppel." And it was said that delay on the part of the officials should not prejudice the public.

In *The L. S. & M. S. Ry. Co.* v. *City of Elyria,* 69 Ohio St., 415, it was held that the city was not authorized to agree to the exclusive occupation of a street and that the company could be com-

pelled to restore the street to its former condition without compensation.

Concerning a wharf dedicated to public use it is held in *Pittsburg* v. *Epping-Carpenter Co.,* 194 Pa. St., 318, that when the public right has been acquired it cannot be lost by nonuser or by municipal action not expressly authorized by law. Any occupation of the property inconsistent with the public right is a nuisance, and no length of time will legalize a public nuisance.

In *Sloan* v. *Biemiller, supra,* at page 512, it is said: "We are not called on in this case to review the doctrine laid down in *Gavit* v. *Chambers* [3 Ohio, 496]. The question before us is, whether the rule there laid down, as applicable to navigable rivers, applies to the owners of land bounding on Lake Erie and Sandusky Bay. In our opinion, it clearly does not. In *The Canal Commissioners* v. *The People,* 5 Wend. 423, Chancellor Walworth said: 'Our large fresh-water lakes or inland seas are wholly unprovided for by the law of England. As to these, there is neither flow of the tide nor thread of the stream; and our local law appears to have assigned the shores down to ordinary low-water mark to the riparian owners, and the beds of the lakes, with the islands therein, to the public.' And in Kent's Commentaries it is laid down that, 'in this country our great navigable lakes are properly regarded as public property, and not susceptible of private property any more than the sea.' 3 Kent's Com. 429, note *a.* The doctrine thus stated is fully supported by the adjudged cases." Citing a number of cases.

In *Illinois Central Rd. Co.* v. *Illinois, supra,* it is held by the United States supreme court that the trust devolving upon the state for the public, and which can only be discharged by the management and control of property in which the public has an interest, cannot-be relinquished by a transfer of the property. There can be no irrepealable contract in a conveyance of property by a grantor in disregard of a public trust, under which he was bound to hold and manage it.

In the opinion Mr. Justice Field says, at page 453: "The State can no more abdicate its trust over property in which the whole people are interested, like navigable waters and soils under them, so as to leave them entirely under the use and control of private parties, except in the instance of parcels mentioned for the improvement of the navigation and use of the waters, or when parcels can be disposed of without impairment of the public interest in what remains, than it can abdicate its police powers in the administration of government and the preservation of the peace. * * * So with trusts connected with public property, or property of a special character, like lands under navigable waters, they cannot be placed entirely beyond the direction and control of the State."

It is further said, at page 455: "The ownership of the navigable waters of the harbor and of the lands under them is a subject of public concern to the whole people of the State. The trust with which they are held, therefore, is governmental and cannot be alienated, except in those instances

mentioned of parcels used in the improvement of the interest thus held, or when parcels can be disposed of without detriment to the public interest in the lands and waters remaining."

The defendants in error contend that the right of the littoral owner to wharf out is a property right which cannot be taken without compensation under the federal and state constitutions. A similar contention was made in *Greenleaf Johnson Lumber Co.* v. *Garrison,* 237 U. S., 251, where the wharves had been erected in keeping with federal and state lines. The claim was not sustained. The proposition announced was: "The power of the sovereign State or Nation is perpetual — not exhausted by one exercise — and all privileges granted in public waters are subject to that power; the exercise of which is not a taking of private property for public use but the lawful exercise of a governmental power for the common good."

In *Scranton* v. *Wheeler,* 179 U. S., 141, it is said, at page 164: "The riparian owner acquired the right of access to navigability subject to the contingency that such right might become valueless in consequence of the erection under competent authority of structures on the submerged lands in front of his property for the purpose of improving navigation."

The authorities show that the right of a riparian or littoral owner is always subject to the paramount authority of the state and federal governments for the ends set forth.

In this case the defendants aver in their answer that the work complained of was and is for the

purpose of enabling them to reach navigation and to perform their duties as common carriers. They insist they have no other object. No other purpose and no other result is allowable. In the absence of legislation by the state touching the subject and until the enactment of such legislation, this was their right.

The record does not disclose any different purpose nor that defendants appropriated any part of the public property with the ulterior motive of diverting it to private ends. Therefore, the judgments below must be affirmed.

It is to be presumed that the legislature, in the enactment of legislation on the subject, will appropriately provide for the performance by the state of its duty as trustee for the purposes stated; that it will determine and define what constitutes an interference with public rights and that it will likewise, in a spirit of justice and equity, provide for the protection and exercise of the rights of the shore owners.

*Judgment affirmed.*

NICHOLS, C. J., DONAHUE and JONES, JJ., concur.