THOMAS ET AL., APPELLANTS, *v.*
SANDERS ET AL., APPELLEES.

[Cite as Thomas v. Sanders (1979), 65 Ohio App. 2d  5 .]

(No. E-78-40—Decided June 8, 1979.)

*Mr. Dennis E. Murray,* for appellants.
*Mr. Richard H. Hamilton* and *Mr. William H. Smith,* for appellees.

CONNORS, J. This case is an appeal from a judgment entered in the Court of Common Pleas of Erie County granting title to certain property to the defendants, K.Y.S., Inc., and John Sanders, and holding that plaintiffs, the Thomases, and the third-party complainant, the city of Sandusky, have no right, claim or title to said property.

The property in dispute concerns a piece of land of approximately 0.325 acres, situated at the end of a wharf known as the "Mud Dock" and extending from the shore line within the city of Sandusky into Sandusky Bay. This strip of land was purchased by the defendants, K.Y.S. and John Sanders, in 1977 from the trustees of the bankrupt Penn Central Railroad. The Mud Dock was constructed in the mid-1800's by the early railroads who were owners of the property abutting the water of Sandusky Bay. The wharf was constructed at such an angle that the end of the wharf lies in the area which the city claims is a public right-of-way in the waters of the bay and known as the "Lawrence Street slip." The original town plat filed in 1818 established Lawrence Street which ran perpendicular to the shore line and extended to the edge of the bay. The city alleges that Lawrence Street extends into the bay, creating a public slip and that the extension of the Mud Dock into the area of that slip is an encroachment onto the public domain for which title cannot be held by a private party.

The original complaint was filed by plaintiffs-appellants, the Thomases, who operated a marina as tenants at will of the city of Sandusky on the disputed real estate, to enjoin defendants-appellees, K.Y.S. and John Sanders, from asserting rights of possession against the plaintiffs. Defendant-appellant, the city of Sandusky, moved to intervene as a third-party complainant and prayed, *inter alia,* for a judgment establishing its interest in the Mud Dock and to enjoin the defendants, K.Y.S. and John Sanders, from asserting any claim adverse to the city in said land. From the judgment of the Court of Common Pleas of Erie County finding title to the Mud Dock to be in the defendants, K.Y.S., Inc., and John Sanders, the Thomases and the city of Sandusky have appealed.

Assignment of Error No. 1 reads as follows:

"1. The trial court was in error in finding that Sandusky Bay is a part of Lake Erie and therefore all underwater lands

beneath the Sandusky Bay within the corporate limits of the city of Sandusky by virtue of the Fleming Act ORC 123.03 are held in trust by the state of Ohio for the city of Sandusky."

The original town plat of the city of Sandusky was filed on June 5, 1818, establishing the town along the shores of Sandusky Bay. The plat essentially extended the border of the town into the bay to the channel waters thereof by designating certain ownership rights to the waterfront lot owners. The city was incorporated in 1824 and reincorporated in 1845 by acts of the Ohio General Assembly which established the boundaries of the city of Sandusky to include the submerged lands out to the center of Sandusky Bay.

The Fleming Act (107 Ohio Laws 587) was enacted by the Ohio General Assembly in 1917, declaring that the waters of Lake Erie and the soil beneath the waters do now and have always, since the organization of the state of Ohio, belonged to the state as proprietor in trust for the people of the state. See R. C. 123.03.[1] The Act further provided for municipal corporations to have the use and control of the waters and soil of Lake

---

[1] R. C. 123.03 reads as follows:

"It is hereby declared that the waters of Lake Erie consisting of the territory within the boundaries of the state, extending from the southerly shore of Lake Erie to the international boundary line between the United States and Canada, together with the soil beneath and their contents, do now and have always, since the organization of the state of Ohio, belonged to the state as proprietor in trust for the people of the state, for the public uses to which it may be adapted, subject to the powers of the United States government, to the public rights of navigation, water commerce and fishery, and further subject to the property rights of littoral owners, including the right to make reasonable use of the waters in front of or flowing past their lands. Any artificial encroachments by public or private littoral owners, which interfere with the free flow of commerce in navigable channels, whether in the form of wharves, piers, fills, or otherwise, beyond the natural shore line of said waters, not expressly authorized by the general assembly, acting within its powers, or pursuant to section 123.031 of the Revised Code, shall not be considered as having prejudiced the rights of the public in such domain. This section does not limit the right of the state to control, improve, or place aids to navigation in the other navigable waters of the state or the territory formerly covered thereby.

"The department of administrative services is hereby designated as the state agency in all matters pertaining to the care, protection, and enforcement of the state's rights designated in this section.

"Any order of the director of administrative services in any matter pertaining to the care, protection and enforcement of the state's rights in said territory shall be deemed a rule or adjudication within the meaning of sections 119.01 to 119.13 of the Revised Code."

Erie which lie within the corporate limits of any municipal corporation. See R. C. 721.04.[2] The Act does not clearly state whether Sandusky Bay is part of Lake Erie, nor has research revealed any cases which have expressly resolved the question. To the extent that the trial court so held, we disagree that the present law, in a general meaning, originated in 1917 with the passage of the Fleming Act. The principle of state dominion over the navigable waters within its boundaries has been carried over from the common law of England and is firmly established in American jurisprudence, as stated in *Martin* v. *Waddell* (1842), 41 U. S. 367, 410 (16 Pet. 367, 410):

"***For when the Revolution took place, the people of each state became themselves sovereign; and in that character hold the absolute right to all their navigable waters and the soils under them for their own common use, subject only to the

[2] R. C. 721.04 reads as follows:

"Any municipal corporations within the limits of which there is included a part of the shore of the waters of Lake Erie may, in aid of navigation and water commerce, construct, maintain, use, and operate, piers, docks, wharves, and connecting ways, places, tracks, and other water terminal improvements with buildings and appurtenances necessary or incidental to such use, on any land belonging to the municipal corporation held under title permitting such use, and also over and on any submerged or artificially filled land made by accretion resulting from artificial encroachments, title to which is in the state, within the territory covered or formerly covered by the waters of Lake Erie in front of littoral land within the limits of such municipal corporation, whether such littoral land is privately owned or not.

"Any such municipal corporation may, by ordinance, subject to federal legislation, establish harbor lines and other regulations for such territory and prohibit the placing, maintaining, or causing or permitting to be placed therein any unlawful encroachments on such territory.

"The territory to which this section applies is limited to that within the limits of the municipal corporation and extending into Lake Erie to the distance of two miles from the natural shore line. For all purposes of government and exercise of such powers the limits of any such municipal corporation shall be held to extend out, in, over and under such water and land made or that may be made within such territory. This section does not limit the now existing boundaries of any municipal corporation. Where two municipal corporations have upland territory fronting on such waters, and there is a conflict because of the curve of the shore line or otherwise as to such two mile boundary, the boundaries of each such municipal corporation may be determined by agreement between the municipal corporations concerned.

"All powers granted by this section shall be exercised subject to the powers of the United States government and the public rights of navigation and fishery in any such territory. All mineral rights or other natural resources existing in the soil or waters in such territory, whether now covered by water or not, are reserved.to the state."

rights since surrendered by the Constitution to the general government. * * * "

Similarly, it was stated in *Illinois Central Rd. Co.* v. *Illinois* (1892), 146 U. S. 387, at page 437:

"* * *[T]he same doctrine as to the dominion and sovereignty over and ownership of lands under the navigable waters of the Great Lakes applies, which obtains at the common law as to the dominion and sovereignty over and ownership of lands under tide waters on the borders of the sea, and * * * the lands are held by the same right in the one case as in the other, and subject to the same trusts and limitations. * * * "

In 1916, one year before passage of the Fleming Act, the Ohio Supreme Court announced the opinion of *State* v. *Cleveland & Pittsburgh Rd. Co.* (1916), 94 Ohio St. 61, wherein the syllabus reads, in part, as follows:

"2. The title and rights of littoral and riparian proprietors in the subaqueous soil of navigable waters, within the limits of a state, are governed by the laws of the state, subject to the superior authority of the federal government.

"3. The title of the land under the waters of Lake Erie within the limits of the state of Ohio, is in the state as trustee for the benefit of the people, for the public uses to which it may be adapted."

It is clear to this court that the trust doctrine of state control over the submerged lands of Lake Erie and its bays for the beneficial ownership of the public, which originated in England and has been strongly reinforced in this country by judicial decision, has existed in this state since Ohio was admitted to the union in 1803. Consequently, any acts of ownership or dominion over the waters and subaqueous terrain of Sandusky Bay by the city of Sandusky, including the filing of the town plat and the acts of incorporation, have been done subject to the superior authority of the state of Ohio. The passage of the Fleming Act in 1917 merely codified the existing law in this state with respect to a particular body of water, *i.e.*, Lake Erie. See *State* v. *Cleveland & Pittsburgh Rd. Co., supra.* The Fleming Act did not purport to change the common law with regard to other navigable waters in this state.[3] The title to the

_____

[3] There is a distinction between property bordering the navigable waters of lakes and bays (littoral land) and property bordering navigable streams (riparian

waters and the land beneath the waters of Sandusky Bay is now and always has been held by the state in trust.

Since the appellants assign error to the trial court's finding that the bay is part of Lake Erie, we are required to rule upon the question. Having reviewed the record and the law, we are of the opinion that Sandusky Bay is connected to and an inseparable part of the navigable waters of the Great Lakes and, therefore, is a part of Lake Erie. The city and the state, in asserting dominion over the bay, are not required to do so to the exclusion of each other. There is nothing inconsistent with the city's corporate limits extending to the center of the bay and the holding that the same territory is held in trust by the state. In view of this determination, we hold that the waters of the bay, including those areas within the corporate limits of the city of Sandusky, are within the provisions of the Fleming Act and its related statutory sections. Appellants' first assignment of error is not well taken.

The second and third assignments of error read as follows:

"2. The trial court was in error in finding that there is no record that Lawrence Street was extended past the boundary of the Water Street right of, way.

"3. The trial court was in error in finding that the city of Sandusky is estopped to claim title or control over the Mud Dock which encroaches into Lawrence Street slip and that K.Y.S. Inc. and John Sanders have title to said encroachment."

The original plat of the city of Sandusky was recorded on June 5, 1818, and established the location and dimensions of streets, public grounds and lots. The plat designated Water Street which street ran directly along the edge of Sandusky Bay and was bounded on the north by water lots which were all two rods wide in front on Water Street and extended northerly to the channel waters of the bay. Apparently, these water lots were composed entirely of subaqueous land in 1818. The plat further designated several streets, including Lawrence Street, which ran perpendicular to Water Street, "with open

land). Pursuant to Ohio law, as was true under the common law, the title of lands bordering on a navigable stream extends to the middle of the stream. *Day* v. *Rd. Co.* (1886), 44 Ohio St. 406; *June* v. *Purcell* (1881), 36 Ohio St. 396; *Gavit* v. *Chambers* (1828), 3 Ohio 496; *State, ex rel. Brown,* v. *Newport Concrete Co.* (1975), 44 Ohio App. 2d 121.

and public strips to the waterfront," each at a specified width. The plat made reference to a document recorded with the Huron County Recorder wherein it states that the water lots go to the channel waters and the slips between the water lots at each street are eight poles wide.

Subsequent to the filing of the plat, the area directly north of Water Street was filled in as the town moved north into the bay and another street eventually replaced Water Street as the street running along the shore of the bay. Early records of the city of Sandusky indicate that the water lot owners, the early railroads, were assessed for the filling in of this area and that the city assessed itself for the filling in of the public slips, including Lawrence Street. Other exhibits introduced by the city indicate that the city has continuously exercised control over access to the water at the several public slips, including the Lawrence Street slip, after the bay was filled in north of Water Street. The records also reveal a city sewer that runs north of Water Street and empties into the bay at the Lawrence Street slip which has always been under the control and maintenance of the city.

From a consideration of all the evidence, we conclude that the trial court was in error in finding that Lawrence Street did not extend north of Water Street to the waters of Sandusky Bay. Appellants' second assignment of error is well taken.

To resolve the issue presented by the third assignment of error, it must first be determined whether Lawrence Street extends into Sandusky Bay and thus creates a public right-of-way or public slip. As indicated, corresponding to the ends of certain streets on the original town plat were strips of land which ran to the waterfront and extended into the bay as public slips between the water lots. After the filing of the town plat in 1818, the city of Sandusky was incorporated in 1824 and was reincorporated in 1845. The acts of incorporation established the boundaries of the city of Sandusky to include the submerged lands out to the center of Sandusky Bay. The city introduced other evidence which indicated a continuous exercise of control over the public slips. Based on the original town plat, acts of incorporation, ordinances and other actions of council, we conclude that there does exist a public slip at the end of Lawrence Street and that said public slip extends northerly into the bay to the channel line. From that point north,

the balance of the waters to the center of the bay and within the corporate limits of the city of Sandusky are public waters held in trust by the state of Ohio for the benefit of the public, subject to the city's rights delegated to it by R. C. 721.04.

It is a matter of record in this case that the early railroads owned the water lots that abut the Lawrence Street slip. By virtue of the original town plat, these owners have claimed more than a littoral right to wharf out beyond the natural shore line to navigable waters. Cf. *State, ex rel. Squire,* v. *Cleveland* (1948), 150 Ohio St. 303. The owners have claimed title in fee simple absolute to the subaqueous land out to the channel line. Contrary to law, these water lot owners maintain that they could fill in this section of the bay and assert claim of title to the real estate created. The evidence and exhibits presented in the trial court reveal that this was done at several places along the waterfront within the Sandusky city limits without any objection on the part of the city.

The property in dispute in the case before this court was formerly a part of the bay and was filled in sometime in the mid-1800's by the predecessor of the Penn Central Railroad, the owner of the water lots abutting the Lawrence Street slip. In aid of navigation, the railroad built the Mud Dock so as to run track out to deeper water which was more accessible by loaded watercraft. The particular wharf in question was built at an angle from the shore, presumably to facilitate easier access by the trains. The wharf began at a point well within the area of the shore line owned by the railroad; but because the angle of construction was not perpendicular to the shore line, the end of the wharf crossed the western edge of the Lawrence Street slip, leaving a piece of land of approximately 0.3 acres lying within the area of the slip. The object of the suit is to obtain a judicial determination of the title to this land which has been reclaimed from the waters of the bay. The central issue involved in the controversy is whether title to the land lying within the public slip can be held by private parties to the exclusion of any interest of the city of Sandusky or the state of Ohio.

It is undisputed that the city did not object to the constuction of the Mud Dock, nor to the continued occupancy and use of this area by the railroads. The record is not clear when the railroad discontinued its use of the Mud Dock for railroad pur-

poses, but evidence was introduced showing a lease by the railroad, as lessor, to R. J. Winkel, lessee, in 1965, of four parcels of land surrounding the Lawrence Street slip including the entire Mud Dock. The lessee, under the terms of the lease, was permitted to have occupancy and use of these premises for the operation of a small boat marina. The city again permitted the use of the Mud Dock under the lease, without objection, including the portion within the slip.

In 1966, the railroad sold its interest in the property abutting the Lawrence Street slip to the Erie Sand and Gravel Company. The property described in the deed included a major portion of the Mud Dock, but not that which lies within the slip and which is now in dispute.

The lease to R. J. Winkel was renewed in 1967, but the Mud Dock was excluded as part of the leasehold; however, the lessee, without any authority to do so, continued to use the Mud Dock in connection with his marina business. Soon after the lease was again renewed in 1974, the plaintiffs, the Thomases, purchased the lease, buildings and docks from R. J. Winkel. The Thomases have continued to occupy the Mud Dock; but, they admit that they pay no rent, nor do they have any lease to the Mud Dock.

In 1977, the trustees of the bankrupt Penn Central Railroad, by quitclaim deed, sold the property in question at the end of the Mud Dock to defendant K.Y.S. for $5,850. Defendant K.Y.S. recorded the deed and proceeded to assert rights of possession to the Mud Dock against the Thomases.

On May 31, 1977, the Thomases filed a complaint against the defendants, K.Y.S. and Sanders, seeking an injunction and claiming rightful possession of the Mud Dock on the theory of adverse possession, which claim was later admitted to be groundless. The defendants answered and counterclaimed for damages for wrongful possession. Thereafter, the city of Sandusky intervened as a third-party complainant praying for an injunction against the defendants and a declaration of the rights and interests of the parties in the Mud Dock.

The trial court found that the lands underneath Sandusky Bay were placed under the control of the state of Ohio and the city by virtue of the Fleming Act which was enacted in 1917. Furthermore, the trial court found that the Lawrence Street slip did not exist and that since the Mud Dock was filled in

prior to the Fleming Act, the city was estopped to claim title or control over it. Pursuant to our finding that the Fleming Act merely codified the common law and that the Lawrence Street slip does exist, we are of the opinion that the trial court erred in its ruling and the judgment must be reversed.

The soil beneath the Lawrence Street slip is part of the subaqueous terrain of Lake Erie and, as a consequence, is held in trust by the state of Ohio for protection of public rights. *State* v. *Cleveland & Pittsburgh Rd. Co., supra.* Traditional rights of the public in these waters are the rights of navigation and of fishing, although more recently navigability has been held to include recreational as well as commercial use. *State, ex rel. Brown,* v. *Newport Concrete Co.* (1975), 44 Ohio App. 2d 121. It has been established that the littoral owner of property bordering navigable lakes is held to have an intangible right to make use of those navigable waters by building wharfs in the aid of navigation and commerce, but for no other purpose, and provided the exercise of this right does not interfere with the public rights. *State, ex rel. Squire,* v. *Cleveland* (1948), 150 Ohio St. 303. Furthermore, the case of *State* v. *Cleveland & Pittsburgh Rd. Co., supra,* held that whatever the littoral owner does is done with knowledge on his part that the title to the subsoil is held by the state, as trustee for the public, and nothing can be done which will destroy or weaken the rights of the beneficiary's trust estate. The *Cleveland & Pittsburgh Rd. Co.* case further held that the state, by acquiescence, cannot abandon the trust property or enable a diversion of it by private ends different from the object for which the trust was created. Mere nonuse of the trust property by the public cannot authorize the appropriation of it by private persons to private uses and thus thwart the purpose of the trust, as was stated in *Illinois Central Rd. Co.* v. *Illinois, supra,* at page 454:

"***So with trusts connected with public property, or property of a special character, like lands under navigable waters, they cannot be placed entirely beyond the direction and control of the State."

In the instant case, the railroad attempted to transfer land lying within an area of the public trust and, therefore, alienate the public of their rights to this property under said trust. In our view, this cannot be done under the common law as inter-

preted by the United States Supreme Court and the Ohio Supreme Court, and as codified in R. C. 123.03 and 721.04. Furthermore, the court in *State* v. *Cleveland & Pittsburgh Rd. Co., supra,* at paragraph six of the syllabus, held that "***the state, as trustee for the people, cannot by acquiescence or otherwise abandon the trust property or permit a diversion of it to private uses different from the object for which the trust was created.***"

So long as the railroad maintained the use of the Mud Dock within its projected boundary limits in aid of navigation, it was exercising its right to do so. The defense points to the leases from the railroad to private parties and to the railroad's continued payment of the property taxes on the entire Mud Dock as evidence of state recognition of the railroad's ownership of the entire dock. As stated, the state or city cannot relinquish that land by acquiescence and estoppel does not apply. Moreover, we find that the lease of the end of the Mud Dock was void, *ab initio,* and cannot now be used to claim title to or a recognition of ownership of these premises. See *Cleveland Boat Service* v. *Cleveland* (1955), 102 Ohio App. 255. It is stipulated that the Mud Dock was filled in and did not result from accretion and that that theory of ownership is inapplicable to the present situation.

The defendants, K.Y.S. and Sanders, cite *East Bay Sporting Club* v. *Miller* (1928), 118 Ohio St. 360, and *Hogg* v. *Beerman* (1884), 41 Ohio St. 81, to support the proposition that title to the land beneath Lake Erie and its bays can be held in private ownership to the exclusion of the public. The *East Bay Sporting Club* case is factually distinguishable from the instant case as it involves a non-navigable watercourse which is not a part of Lake Erie or its bays. *Hogg* v. *Beerman, supra,* at paragraph one of the syllabus, holds that land covered by the water of a navigable, landlocked bay or harbor, "connected with Lake Erie, may be held by private ownership***provided the holder derives his title from an express grant made, or sanctioned, by the United States." There is no evidence in the instant case that the owners of the land bordering Sandusky Bay ever received title to the land beneath the bay by express grant of the United States, or otherwise, except the alleged rights granted in the original town plat.

Although a littoral owner has the right to wharf out to

navigable waters in aid of navigation, this right, if it is to be exercised, must be limited to the area within the projected boundaries of the waterfront property. In finding that a portion of the Mud Dock was built upon land lying outside the projected boundary limits of the railroad property and within the Lawrence Street slip, the occupation of that land could not be authorized, even in aid of navigation, because the railroad was not a littoral owner in relation to that area. It follows that the railroad had neither ownership interest, nor possessory interest, in aid of navigation to that portion of the Mud Dock now in dispute. The railroad could not transfer title to that which it did not own; and, consequently, the purported conveyance of the Mud Dock to the defendants, K.Y.S. and Sanders, was a nullity, and the quitclaim deed recorded by these defendants is void. The defendants, K.Y.S. and Sanders, have no claim of title or interest in the property purported to be conveyed to them. To the extent that the property can be put to some public use, the city of Sandusky has the authority to control and regulate the reclaimed land pursuant to R. C. 721.04 to 721.11.[4] The land, however, is still part of the trust estate and the city or state cannot abdicate the trust so as to leave the reclaimed soil in control of private persons. *Illinois Central Rd. Co.* v. *Illinois, supra.*

The judgment of the lower court, finding all title interest to the Mud Dock in the defendants, K.Y.S. and Sanders, by virtue of the quitclaim deed and finding that the city is estopped to claim any interest or control over said property, was in error and the appellants' third assignment of error is well taken.

On consideration whereof, this court finds that substantial justice has not been done the parties complaining. The judgment of the Court of Common Pleas of Erie County is reversed. Coming now to enter the judgment which the trial court should have entered, the court finds that all title and interest in the area of land at the end of the Mud Dock and lying within the Lawrence Street slip is held by the state of Ohio in trust for the people of Ohio; that defendant-appellant, the city

---

[4] A related section, R. C. 123.031, grants the state the authority to lease lakefront land for private improvement. See, also, 1973 Ohio Atty. Gen. Opinions, No. 73-033.

of Sandusky, the third-party complainant, has the authority to control and regulate said land pursuant to R. C. 721.04 to 721.11; and that the plaintiffs-appellants, the Thomases, and the defendants-appellees, K.Y.S., Inc., and John Sanders, have no claim or interest in said land.

*Judgment accordingly.*

POTTER, P. J., and BROWN, J., concur.