**CITY OF TOLEDO**

v.

**KILBURN et al.**

Toledo Municipal Court, Lucas County.

Nos. CRB94–19011, CRB94–19012, CRB94–19015 to CRB94–19017, CRB94–19019 and CRB94–19020.

Decided April 11, 1995.

*John T. Madigan,* Toledo Chief Prosecuting Attorney, for plaintiff.

*Susan Kay Sharkey,* for defendants.

Thomas J. Osowik, Judge.

The court finds that this case came on for determination by the court of the defendants' motion to dismiss, after hearing on March 20, 1995 and upon memoranda submitted by the defendants and the prosecution.

The court finds that on November 24, 1994 the defendants were hunting ducks while physically situated on a dike approximately six hundred yards from the mainland from where the dike commences, at an area known as Cullen Park, which park is located within the limits of the city of Toledo.

The defendants were cited for violating Toledo Municipal Code 505.01, hunting within the city limits.

That section states, in pertinent part, as follows:

"505.01 Hunting Prohibited.

"(a) No person shall hunt any wild bird or wild quadruped within the City limits. For purposes of this section, 'hunt' means to pursue, shoot, kill or capture wild birds or wild quadrupeds, and all other acts such as placing, setting, drawing or employing any device commonly used to kill or capture wild birds or quadrupeds."

The question over title to subaqueous and marginal lands such as that at issue in the case before the court is one that dates back to the common law in England.

In Great Britain, it was well established that title to subaqueous and marginal lands of tidal and navigable waters was in the crown. This concept was likewise held to be applicable in the United States to the waters of Lake Erie, and that title to subaqueous and filled-in lands beyond the high water mark is in the state bordering upon such waters. See *State ex. rel. Squire v. Cleveland* (1948), 150 Ohio St. 303, 322, 38 O.O. 161, 168–169, 82 N.E.2d 709, 719.

One of the leading and controlling cases that discusses ownership of subaqueous and artificial lands is the case of *State v. Cleveland & Pittsburgh RR. Co.* (1916), 94 Ohio St. 61, 113 N.E. 677, where paragraphs one, two and three of the syllabus state:

"1.   Under the constitutional grant of authority to regulate interstate and foreign commerce, the United States government has paramount control of navigable waters and power to establish therein harbor lines and regulations.

"2.   The title and rights of littoral and riparian proprietors in the subaqueous soil of navigable waters, within the limits of a state, are governed by the laws of the state, subject to the superior authority of the federal government.

"3.   The title of the land under the waters of Lake Erie within the limits of the state of Ohio, is in the state as trustee for the benefit of the people, for the public uses to which it may be adapted."

The *Cleveland & Pittsburgh RR. Co.* case was an action in the Common Pleas Court of Cuyahoga county to enjoin railroads from filling in the waters of the Cleveland harbor in Lake Erie in front of their lands. The claim was made by the state that the submerged territory in front of the lands of the railroad companies was owned by the state of Ohio and that the companies were filling up the waters of Lake Erie without any grant from the government of the United States or the state of Ohio.

Justice Johnson, who wrote the opinion in *Cleveland & Pittsburgh RR. Co.,* discussed at length the common law as to title in subaqueous land in tidal and

navigable waters, cited and commented upon many cases in both the federal and state courts, and then stated in the opinion, at 77, 113 N.E. at 681:

"After a careful examination we are convinced that in most of the states of the United States the conclusion has been arrived at, either by judicial reasoning or by statutory provision which has been upheld, that, subject to regulation and control by the federal and state governments, * * * the state holds the title to the subaqueous land of navigable waters as the trustee for the protection of the public rights therein."

The court further stated:

"As shown, the state holds the title to the subaqueous land as trustee for the protection of public rights. The power to prescribe such regulations resides in the Legislature of the state." *Id.* at 79, 113 N.E. at 681.

■ The creation of municipal corporations and their powers and limits are established by the General Assembly of the state of Ohio.

While the defendants contend that the submerged lands of this part of Maumee Bay rest within Washington Township, the court has engaged in a thorough analysis of the geographical boundaries of this area of Western Lake Erie.

The court has reviewed the unpublished opinion of February 8, 1988 of Lucas County Prosecuting Attorney Anthony G. Pizza requested by the Washington Township Board of Trustees. That opinion resulted in a detailed investigation of the transfers of ownership of the Western Lake Erie basin since the founding of the state of Ohio.

■ That study revealed that the boundaries of Washington Township have taken several distinct transformations with the boundaries gradually expanding to include now nonexistent townships. The boundaries have, likewise, receded with the expansion of the limits of the city of Toledo. Lucas County Prosecutor Pizza concluded, as does this court, that title to subaqueous lands in Lake Erie rests in the state of Ohio.

■ For purposes of this case before the court, it is well to remember that the creation and establishment of the limits of any municipal corporation, township or county is within the province and power of the legislature.

■ The evidence presented by the parties demonstrates that the state of Ohio executed a lease with the city of Toledo on September 16, 1959, effective August 31, 1959. This lease concerned certain submerged property located within Maumee Bay for a period of ninety-nine years, renewable forever. That legal description does not acknowledge or refer to any of the submerged property being located within any jurisdictional confines, other than Lucas County.

The General Assembly, in 1953, established once and for all that any and all submerged lands located within Lake Erie are held in trust by the state of Ohio, for the people. R.C. 1506.10 states as follows:

"It is hereby declared that the waters of Lake Erie consisting of the territory within the boundaries of the state, extending from the southerly shore of Lake Erie to the international boundary line between the United States and Canada, together with the soil beneath and their contents, do now belong and have always, since the organization of the state of Ohio, belonged to the state as proprietor in trust for the people of the state, for the public uses to which they may be adapted, subject to the powers of the United States government, to the public rights of navigation, water commerce, and fishery, and to the property rights of littoral owners, including the right to make reasonable use of the waters in front of or flowing past their lands. Any artificial encroachments by public or private littoral owners, which interfere with the free flow of commerce in navigable channels, whether in the form of wharves, piers, fills, or otherwise, beyond the natural shoreline of those waters, not expressly authorized by the general assembly, acting within its powers, or pursuant to section 1506.11 of the Revised Code, shall not be considered as having prejudiced the rights of the public in such domain. This section does not limit the right of the state to control, improve, or place aids to navigation in the other navigable waters of the state or the territory formerly covered thereby.

"The department of natural resources is hereby designated as the state agency in all matters pertaining to the care, protection, and enforcement of the state's rights designated in this section.

"Any order of the director of natural resources in any matter pertaining to the care, protection, and enforcement of the state's rights in that territory is a rule or adjudication within the meaning of sections 119.01 to 119.13 of the Revised Code."

In 1953, the legislature delegated to municipal corporations the power to regulate the water over, above, out, in and over a length of two miles out from the natural shore, as long as that regulation was in the aid of navigation and water commerce. That statute, R.C. 721.04, states as follows:

"Any municipal corporations within the limits of which there is included a part of the shore of the waters of Lake Erie may, in aid of navigation and water commerce, construct, maintain, use, and operate, piers, docks, wharves, and connecting ways, places, tracks, and other water terminal improvements with buildings and appurtenances necessary or incidental to such use, on any land belonging to the municipal corporation held under title permitting such use, and also over and on any submerged or artificially filled land made by accretion resulting from artificial encroachments, title to which is in the state, within the territory covered or formerly covered by the waters of Lake Erie in front of

littoral land within the limits of such municipal corporation, whether such littoral land is privately owned or not.

"Any such municipal corporation may, by ordinance, subject to federal legislation, establish harbor lines and other regulations for such territory and prohibit the placing, maintaining, or causing or permitting to be placed therein any unlawful encroachments on such territory.

"The territory to which this section applies is limited to that within the limits of the municipal corporation and extending into Lake Erie to the distance of two miles from the natural shore line. For all purposes of government and exercise of such powers the limits of any such municipal corporation shall be held to extend out, in, over, and under such water and land made or that may be made within such territory. This section does not limit the now existing boundaries of any municipal corporation. Where two municipal corporations have upland territory fronting on such waters, and there is a conflict because of the curve of the shore line or otherwise as to such two mile boundary, the boundaries of each such municipal corporation may be determined by agreement between the municipal corporations concerned.

"All powers granted by this section shall be exercised subject to the powers of the United States government and the public rights of navigation and fishery in any such territory. All mineral rights or other natural resources existing in the soil or waters in such territory, whether now covered by water or not, are reserved to the state."

Thus, for purposes of geographical, legislative and police powers, the "limits" of governance by a municipal corporation located on the shores of Lake Erie were extended beyond the natural shore out to two miles for the purpose of regulation of navigation and water commerce.

The geographical limits of the city of Toledo reach the shores, and, at one point, are actually located within Maumee Bay. The common-sense definition of Lake Erie embraces all of its bays and harbors. See *Hogg v. Beerman* (1884), 41 Ohio St. 81, and 1977 Ohio Atty.Gen.Ops. No. 77–096. Maumee Bay is clearly a natural bay of Lake Erie.

Thus, the city of Toledo and its limits do include a part of the shore of Lake Erie.

The dike in question is an artificially created embankment, ostensibly constructed of materials from the shore. The undisputed facts establish that the defendants were cited for hunting six hundred yards offshore while on the dike. This was clearly within the territory contained by the lease of 1959 and, therefore, within control of the city of Toledo.

However, the evidence presented indicates that the dike, as in fact constructed, exceeded the lease granted by the state by extending the dike beyond the harbor line up to the area known as Squadron Island. In fact, Squadron Island is now an indistinguishable part of the peninsula constructed by the city of Toledo pursuant to the 1959 lease.

The submerged land leased from the state of Ohio refers only to the property out to the "harbor line" as established by the Secretary of War on January 4, 1899.

This area known as Squadron Island was apparently a man-made island (now part of the dike/peninsula) created by instrumentalities of the federal government sometime after 1892 but before 1956 and apparently abandoned. It, as well as several other islands in Maumee Bay that are no longer in existence, were created from materials dredged from Maumee Bay, *i.e.*, submerged lands. It is only logical to assume that artificially created islands, created from the dredged bed and soils of Maumee Bay, *i.e.*, an integral part of Lake Erie, are also owned by the state of Ohio.

Thus, title to the dike out to the harbor line as established by the Secretary of War on January 4, 1899, is held by the state of Ohio, but leased, essentially forever, to the city of Toledo, and therefore subject to complete control by the city of Toledo, not only pursuant to the terms of the lease, but subject as well to governmental control that applies to navigation and commerce, pursuant to R.C. 721.04.

However, while title to the land from the harbor line up to and including Squadron Island is held completely by the state of Ohio, control over it for purposes of navigation and water commerce has been delegated to the city of Toledo by virtue of R.C. 721.04.

█ It is clear that both the city of Toledo and the state of Ohio can assert dominion over Maumee Bay and that part of the dike from the harbor line up to and including all of the area on the attached island, but are not required to do so to the exclusion of each other. There is nothing inconsistent with the city's corporate limits extending two miles out to the center of the bay and the holding that the same territory is held in trust by the state. See *Thomas v. Sanders* (1979), 65 Ohio App.2d 5, 19 O.O.3d 3, 413 N.E.2d 1224.

The court finds that the dike was originally contemplated by all parties to be part of a comprehensive plan to create a marina.

The traditional rights of the public in these waters are the rights of navigation and of fishing, although more recently navigability has been held to include recreational as well as commercial use. *State ex rel. Brown v. Newport Concrete*

*Co.* (1975), 44 Ohio App.2d 121, 73 O.O.2d 124, 336 N.E.2d 453. See, also, *Thomas v. Sanders* (1979), 65 Ohio App.2d 5, 19 O.O.3d 3, 413 N.E.2d 1224.

█ Thus, the court finds that the regulation of hunting is a regulation in furtherance of the aid of navigation and water commerce, as that definition is to include recreational and commercial use.

█ Therefore, based upon these findings of fact, the city of Toledo, for purposes of government in the aid of navigation and water commerce, including commercial and recreational uses, may enact such regulations that cover any artificially created island and/or causeway situated in Maumee Bay for a length of two miles from the natural shore and, further, for purposes of defining the corporation "limit," the geographical limit extends to two miles out from the natural shore.

Thus, the geographical limits of all municipalities whose limits reached the natural shore of Lake Erie were expanded by the legislature in 1953 with the enactment of R.C. 721.04, for the purposes of governance in the aid of navigation and water commerce.

Based upon these findings of fact and conclusions of law, the defendants' motion to dismiss is found not well taken and is DENIED.

*So ordered.*